THOMAS J. DURKIN AND COLETTE A. DURKIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JEROME A. GROSSMAN AND SYBIL G. GROSSMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18885-82, 25313-82, 22937-83, 4229-84, 17602-84, 17677-84, 27623-84.        Filed December 22, 1986.

---

*Alan F. Segal*, for the petitioners in all dockets.

*Calvin Eisenberg*, for the petitioners in all dockets except docket No. 22937-83.

*Bryan R. Sullivan* and *Thomas J. Kane*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes:

| Petitioners | Docket Nos. | Year | Deficiency | Addition to tax sec. 6651(a)(1), I.R.C. 1954 [1] |
|---|---|---|---|---|
| Thomas J. Durkin and | 25313-82 | 1977 | $18,642.56 | - - - |
| Colette A. Durkin | 18885-82 | 1978 | 35,162.50 | - - - |
| | 27623-84 | 1979 | 33,376.74 | - - - |
| | 4229-84 | 1980 | 17,275.58 | - - - |
| Jerome A. Grossman and | 22937-83 | 1978 | 46,196.00 | $10,513 |
| Sybil G. Grossman | 17677-84 | 1979 | 53,395.00 | - - - |
| | 17602-84 | 1980 | 13,802.00 | 3,450 |

After concessions by the parties, the issues for decision are: (1) Whether the petitioner, Thomas Durkin, as a limited partner in a partnership which purportedly owned two motion pictures, and the petitioner, Jerome A. Grossman, as an indirect limited partner in a partnership which purport-

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

edly owned four motion pictures, are entitled to deductions for distributive shares of losses reported by the partnerships, and, if so, what are the appropriate partnership deductions; (2) whether the petitioners are entitled to investment credits for their investments in such motion pictures; and (3) whether this Court erred in quashing the Commissioner's subpoenas duces tecum.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Thomas J. and Colette A. Durkin, husband and wife, resided in Westchester, Illinois, at the time they filed their petitions. They filed their joint Federal income tax returns for 1977, 1978, 1979, and 1980 with the Internal Revenue Service Center at Kansas City, Missouri. The petitioners, Jerome A. and Sybil G. Grossman, husband and wife, resided in Northbrook, Illinois, at the time they filed their petitions. They filed their joint Federal income tax returns for 1978, 1979, and 1980 with the Office of the District Director of Internal Revenue, Chicago, Illinois.

During all the years at issue, Paramount Pictures Corp. (Paramount) was a subsidiary of Gulf & Western Co. (G & W), a diversified holding company. During such years, Paramount was an industry leader engaged in the production, acquisition, and distribution of feature motion pictures, and in the production and distribution of television movies and series. Paramount's production facilities were located in Los Angeles, and its distribution activities were coordinated in New York. It also had approximately 40 branch offices throughout the country involved in motion picture distribution. It made substantially greater profit from distribution than it did from production. It sought to supply its large distribution network with between 15 and 20 motion pictures per year.

Since 1968, Charles J. Arney, Jr., has held various positions at Paramount and its parent company, G & W. In 1972, he was the assistant controller at Paramount. In 1975 and 1976, he took the position of director of treasury operations. In November 1977, he became the president of Gulf & Western-Canada, Ltd. In January 1979, he went to

the west coast as the tax department representative at Paramount. In October 1979, he started working for Arthur Barron, the executive vice president of finance and administration for Paramount. Mr. Arney was the principal negotiator for Paramount in the transactions at issue in this case.

Calvin Eisenberg is an attorney who worked for the Internal Revenue Service for approximately 4 years. In 1966, he joined the law firm of Levenfeld & Kanter (the law firm),[2] where he has worked ever since. Prior to 1977, he was involved in establishing several motion picture "service company" partnerships. Such a partnership was responsible for all aspects of bringing a motion picture into existence for a fixed price. Paramount was a partner in several of such partnerships.

John Heyman has been involved in the entertainment industry for many years. Upon graduation from Oxford University Graduate School, he began working in the commercial television industry creating, writing, and packaging shows. Packaging a show consists of organizing all the nontechnical aspects of the show, such as the script, the director, and the cast. Later, he became a theatrical agent representing, among others, Elizabeth Taylor, Richard Burton, Richard Harris, Lawrence Harvey, Trevor Howard, and Burt Bacharach. As an agent of highly sought after entertainers, his primary duties were to identify the best jobs and to negotiate the contracts for such jobs. He negotiated his first "negative pick-up" deal with Paramount in 1971 or 1972. Such a deal involves the purchase of the negative of a motion picture after it has been completed; the purchaser picks up the film as a finished product. The purchase can be contracted for at anytime, including before production starts. He successfully negotiated six or seven such deals in 1977, a similar number in 1978, and eight or nine in 1979.

World Film Services, Ltd. (WFS), is a British concern which was formed by Mr. Heyman in the early 1960s. Since the inception of WFS, he has owned all but 1 share of its stock and has served as a director. The remaining share is held by a nominee, as required by British law. During the

---

[2]The law firm has changed name and membership several times since 1966. Currently, the law firm of Levenfeld, Eisenberg, Janger, Glassberg & Samotny is a successor.

mid-1970s, WFS usually had between 6 and 20 full-time employees in the London office. During the production of a film, WFS had as many as 300 employees.

In 1973, the Film Writers Co. (FWC),[3] a California corporation, was formed as a subsidiary of WFS through the merger of the West Coast Film Writers Co. and the East Coast Film Writers Co. Such corporation was a signatory to the Writers Guild of America basic agreement, the Producers-Writers Guild of America Pension Plan, and the Motion Picture Health and Welfare Fund. It has been involved in several ventures in the entertainment industry. The corporation had no more than 6 employees when not in production, and up to 200 when in production.

During the years at issue, Bernard M. Filler was the chief operating officer and principal shareholder of Capital B Corp. (Capital B). Prior to graduating from Stanford Law School in 1962, he attended the University of Illinois and passed the Certified Public Accountant's exam. Mr. Filler served on the board of editors of the Stanford Law Review and is a member of The Order of the Coif. For 7 years, while in New York, he practiced law in the areas of corporate securities, investment banking, and finance while an associate at Paul, Weiss, Rifkind, Wharton & Garrison. In 1974, he became partner in charge of corporate development at the Chicago law firm of Holleb, Gerstein & Glass (the Glass firm).

In 1977, Mr. Filler decided to abandon the practice of law and to form an investment banking firm, Capital B. The initial share distribution of Capital B was 40 percent to Mr. Filler, 50 percent to members of the law firm, or trusts or partnerships associated with them, and 10 percent to members of the Glass firm. For the years 1977 through 1980, Mr. Filler was the president of Capital B. At various times during such years, Roger Baskes, Mr. Eisenberg, Steven Felsenthal, Stanford L. Glass, and Milton Levenfeld were the other officers of Capital B. Messrs. Baskes, Eisenberg, Filler, Glass, Kanter, and Levenfeld, together with Robert Gerstein, Michael Friedberg, and Richard K.

---

[3]FWC has changed its State of incorporation several times during its existence. Where of aid, the State if incorporation will be indicated, e.g., FWC-Cal.; where not relevant, the State of incorporation will not be indicated.

Janger served as directors of Capital B during such years; Messrs. Filler, Glass, and Kanter served in such capacity every year. Messrs. Baskes, Eisenberg, Friedberg, Janger, Kanter, and Levenfeld were partners in the law firm, Mr. Felsenthal was an associate of the law firm, and Messrs. Gerstein and Glass were partners in the Glass firm.

During the first months of 1977, Capital B actively sought to participate in a number of bona fide investment banking projects. Because Mr. Filler believed that the presence of partners of the law firm and the Glass firm gave potential customers the impression that Capital B had the resources to meet their needs, he frequently asked such partners to participate in meetings with potential customers. In May 1977, Capital B received its first fee, in the amount of $6,000, from the syndication of an oil and gas partnership. Mr. Filler wrote memorandums concerning his activities. Such memorandums were distributed to the Capital B board of directors.

From 1977 through 1980, Capital B served as a general partner in at least 10 motion picture negative pickup partnerships organized with the assistance of the law firm. For each such year, at least 85 percent of Capital B's gross receipts were guaranteed payments from such partnerships. Starting on January 1, 1978, Capital B paid the law firm a monthly retainer of $75,000; a few months later, such retainer was increased to $100,000 per month.

Prior to the establishment of Capital B, Mr. Eisenberg determined that motion picture service company transactions were not very profitable and were difficult to structure and manage. Additionally, section 280, added to the Code by section 210 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1544, required individuals to capitalize the cost of producing films and to amortize such cost essentially in conformity with the income-forecast method. Such requirement decreased the profitability of motion picture service company partnerships which had previously been allowed to deduct the full costs of production as they were incurred. As a result, Mr. Eisenberg has not been involved in forming any such partnerships since the time of the 1976 act.

In 1977 and 1978, all of the motion pictures purchased by Mr. Heyman through FWC were sold to partnerships organized by Capital B and Mr. Eisenberg. In 1979, FWC again sold films to such partnerships, and FWC sold $108 million or $109 million worth of films to a British bank. In 1980, FWC effectively stopped doing business in the United States. Such stoppage resulted from the breakup of the law firm and resultant divided loyalties on the part of Mr. Heyman. At the same time, Mr. Heyman did a great deal of business in England.

In 1980, on the advice of its accountant, FWC transferred certain of its assets and liabilities to a wholly owned subsidiary, FWC-Del. Such transfer was made to avoid certain New York State income taxes. FWC-Del. opened an office in Chicago in the same building as the offices of the law firm. Lester Bernstein, president of FWC-Del., accepted the assignment from FWC of certain motion picture acquisition agreements and purchase agreements, including those concerning the transactions at issue. Notification of such assignments was sent to Paramount by FWC. Such notification was prepared by the law firm and signed by Pamela H. Osowski. Paramount acknowledged receipt of such notification in a letter to the law firm. At such time, Mr. Bernstein was involved in other activities concerning the law firm.

In March or April of 1977, Mr. Heyman contacted Mr. Eisenberg and asked if he would be interested in purchasing two motion pictures which FWC was in the process of obtaining. Such films were "The Bad News Bears in Breaking Training" ("Bears 2"), a Paramount picture, and "Greased Lightning," a Warner Brothers picture. Although Mr. Filler was apprehensive about the enterprise, it was decided that Capital B would form a limited partnership to purchase such films.[4] At that time, it was agreed that Mr. Eisenberg, who had known Mr. Filler since 1974 or 1975, would provide the expertise for negotiations and other activities where his knowledge of the film industry would be helpful, and that Mr. Filler would handle the administrative details of such partnership. Shortly thereafter, Capital B

---

[4]Use of such terms as "acquisition," "purchase," "assign," "sale," "own," "interest," "principal," and "price" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved herein.

formed Ambassador Associates (Ambassador), a limited partnership. Such partnership, like those involved in the case at hand, was intended to engage in negative pickup transactions.

On July 27, 1977, FWC purchased "Bears 2." Due to the lack of subscriptions, such motion picture was the only one purchased by Ambassador. On the same day, FWC entered into a letter agreement with Paramount under which the parties agreed to the sale and distribution of six other motion pictures under terms substantially the same as those in the acquisition agreement and the distribution agreement pertaining to "Bears 2." The motion pictures included in such letter agreement were: "Saturday Night Fever," "Duellists," "Heaven Can Wait," "Looking For Mr. Goodbar," "First Love," and "The One and Only." Such letter agreement set forth the closing and release dates, and the acquisition agreement and distribution agreement terms for each motion picture. Although not legally committed to do so, in July 1977, limited partnerships formed by Capital B purchased all six pictures.

The acquisition agreement, dated November 2, 1977, by which Paramount sold "First Love" to FWC provided, in pertinent part:

1. SELLER'S REPRESENTATIONS AND WARRANTIES: The SELLER represents and warrants that as of the date hereof:

    *     *     *     *     *     *     *

1.8 SELLER has obtained customary Errors and Omissions Insurance from Fireman's Fund pursuant to SELLER's blanket policies, such coverage to be for the benefit of SELLER and PURCHASER as their interest may appear. * * *

    *     *     *     *     *     *     *

1.14 Except for the purchase price payable hereunder, and the gross receipts participations and deferments listed in Exhibit "A" annexed hereto, and customary musical performance rights payments and "residual" payments pursuant to applicable collective bargaining agreements, no sums are or will be due or payable by the PURCHASER with respect to the PICTURE or by anyone authorized by the PURCHASER to exercise any of the rights, powers, licensese [sic] and privileges herein granted to the PURCHASER. This warranty shall not be applicable to any sums due or payable by reason of any transactions entered into by PURCHASER with respect to the PICTURE, except insofar as such transaction shall cause any sums to become due and/or payable pursuant

to an agreement and/or commitment made by SELLER or by which SELLER is bound.

1.15 * * * The SELLER is the copyright proprietor of the PICTURE. * * *

1.16 The PICTURE was produced in the United States of America.

\* \* \* \* \* \* \*

1.18 The SELLER has obtained all the necessary documentation authorizing the production, exhibition, performance, distribution, marketing and exploitation of the PICTURE and the rights sold hereunder, throughout the world, for any and all purposes, and by every means, method and device now or hereafter known and required for the full, complete and unlimited exercise and enjoyment by the PURCHASER, its grantees and licensees, of each and all of the distribution, exhibition, broadcast and exploitation rights sold to the PURCHASER, and the PURCHASER shall own, possess and enjoy all such rights without any liability or obligation to or hindrance by any person, firm or corporation, except as otherwise specified herein.

\* \* \* \* \* \* \*

3. SALE: SELLER hereby sells to PURCHASER and PURCHASER hereby purchases from SELLER all of SELLER'S rights, title and interest of any and every kind and character whatsoever in and to the PICTURE, the copyright therein (and all renewals and extensions thereof), and the original negative thereof. Without limiting the generality of the foregoing, SELLER hereby sells, transfers and assigns to PURCHASER all of those items specified in Exhibit "B" attached hereto, all rights, title and interest in and to the PICTURE and any and all parts thereof and the literary, musical and dramatic material contained therein (but only as embodied therein) throughout the world, and the sole, exclusive and irrevocable right, license and privilege, under copyright and otherwise, to distribute, sub-distribute, reproduce[,] exhibit, project, license, perform, sell, market, broadcast, issue, reissue, and advertise, publicize, dispose of, turn to account, derive revenue from and otherwise exploit and deal in and with the PICTURE and any and [all] parts thereof throughout the world, in any and all media, methods, system and process, whether now known or hereafter devised and in all gauges film and other surfaces, whether in movie theatres, on armed forces bases[,] on ships, on aircraft, on radio, on television (including, without limitation, free, cable, subscription and pay), through cassettes, cartridges, tapes and other audio or video devices, CATV and any other method or means for the exhibition, performance or exploitation of the PICTURE theatrically[,] non-theatrically, and/or by means of television, in any and all gauges, forms, procedures or processes or in any other fashion or through any other medium whatsoever, whether now known or hereafter devised and in all languages. The literary and dramatic material included in the PICTURE shall be deemed sold to PURCHASER only to the extent included in the PICTURE. The music rights sold shall be subject to the conditions contained in the licenses relating thereto.

4. TERRITORY AND TERM: The Territory covered by this Agreement shall consist of the entire world. The term hereof shall be in perpetuity.

5. DELIVERY:

5.1 The SELLER shall deliver the PICTURE to PURCHASER promptly upon execution hereof by making physical delivery to MGM Laboratory Inc. at 10202 West Washington Boulevard, Culver City, California 90030 (herein the LABORATORY), in the PURCHASER'S name but at the SELLER'S sole cost and expense, of each and all of the film and sound material specified in Exhibit "C" attached hereto and made a part hereof. SELLER shall also cause to be delivered to PURCHASER, at SELLER's expense, a laboratory letter from said LABORATORY, in form and substance like that attached hereto as Exhibit "C", certifying that said LABORATORY holds said materials to the PURCHASER'S account and for the PURCHASER'S sole benefit, and certifying further that the negative of the PICTURE and the other items so delivered are of a grade and quality satisfactory for the reproduction of commercially acceptable 35mm release prints of the PICTURE with synchronized English language dialogue and sound track.

5.2 The pre-printed material pertaining to the PICTURE shall be kept at the LABORATORY in the name of PURCHASER or its designee or the distributor whom PURCHASER or its designee licenses to distribute the PICTURE, PURCHASER being hereby authorized to transfer said materials to the account of said distributor and/or designee, but in all events subject to the provisions of the Security Agreement referred to hereinafter.

5.3 SELLER shall also deliver to PURCHASER in addition to the materials specified on Exhibit "B":

a) A verified statement showing the Negative Cost[5] of the PICTURE, including overheads to SELLER of 25% of the direct costs of production and interest, to be not less than $2,496,000.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

6. DISTRIBUTION AND CONTROL OF PICTURE:

6.1 Subject to the provisions of this Agreement, and all exhibits attached hereto, the PURCHASER shall, at all times, have full control in its absolute discretion over the manner and terms upon which the PICTURE shall be marketed, distributed, exploited, exhibited, sold, licensed or otherwise disposed of, and all matters pertaining thereto. So long as the arrangements for the distribution of the PICTURE are made through a "major" distributor (as that term is understood in the motion picture industry), PURCHASER shall have the right to delegate the authority granted herein to such distributor.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

---

[5]The negative cost of a picture is the total direct cost involved in the manufacture of the film, including "below-the-line" elements, such as, producers' fees, directors' fees, actors' fees, script costs, the costs associated with the acquisition of underlying rights, technicians' fees, laboratory costs, film cost, and the cost of building sets.

7. PURCHASE PRICE

The purchase price for all rights and property sold, transferred and assigned by SELLER to PURCHASER hereunder shall be the sum of $2,496,000.00, payable as follows:

a) The sum of $116,000, payable $15,000 contemporaneously herewith by delivery to SELLER of a bank check in said amount, subject to collection, receipt whereof is hereby acknowledged and $101,000 on December 1, 1977.

b) The sum of $208,000 payable by delivery to SELLER upon execution hereof of PURCHASER'S non-interest bearing promissory note in the amount of $208,000 payable to the order of SELLER, which note shall have a maturity date of June 30, 1978, and which shall be a recourse note in the form like that set forth in Exhibit "D" attached hereto.

c) The sum of $2,172,000 payable by delivery to SELLER upon execution hereof of PURCHASER'S promissory note in the amount of $2,172,000 payable to the order of SELLER, which note shall have a maturity date of June 30, 1986, with interest on the unpaid balance at the rate of 8% per annum, which note shall be in form like that set forth in Exhibit "E" annexed hereto and which note shall be a non-recourse note, i.e. SELLER'S rights to payment thereof shall be limited solely to payment thereof out of the percentage payments if any, derived by PURCHASER from the distribution of the PICTURE.

       \*       \*       \*       \*       \*       \*       \*

10. COLLATERAL SECURITY:

10.1 As collateral for payment of the promissory notes to be executed by the PURCHASER hereunder, the PURCHASER shall execute and deliver to SELLER a security agreement \* \* \* granting SELLER the first and prior security interest and lien upon all the right, title and interest of the PURCHASER in and to the PICTURE, \* \* \* and all other property and rights acquired by PURCHASER hereunder. \* \* \*

       \*       \*       \*       \*       \*       \*       \*

2. INDEMNITY: SELLER agrees to defend, indemnify and hold harmless the PURCHASER, \* \* \* its \* \* \* successors and assigns, \* \* \* from and against any charges, damages, costs and expenses, \* \* \* which may be sustained or suffered by or secured against them or any of them by reason of, based upon or relating to, a breach of any of the SELLER'S covenants, representations, warranties or agreements contained herein, or in the exercise or attempted exercise of any of the rights, licenses or privileges herein granted \* \* \*

Such agreement was signed by P.B. Powell for Paramount and Ms. Osowski for FWC. The acquisition agreements for all the other films were signed by Walter Joseph, Jr., for Paramount and Ms. Osowski for FWC.

The acquisition agreements for the other films were nearly identical to the "First Love" acquisition agreement.

The acquisition agreements for "The One and Only" and "Heaven Can Wait" were dated December 2, 1977. The total purchase price of "The One and Only" was $4,770,000: $5,000 payable contemporaneously with execution of the acquisition agreement, $207,000 payable on December 20, 1977, a recourse promissory note for $53,500 with a maturity date of June 30, 1978, a similar note for $477,000 payable on June 30, 1979, and a nonrecourse interest-bearing promissory note for $4,027,500 with a maturity date of June 30, 1986.[6] The total purchase price of "Heaven Can Wait" was $12,534,500: $10,000 payable contemporaneously with execution of the acquisition agreement, a recourse promissory note for $914,000 with a maturity date of June 30, 1978, a similar note for $1,384,625 payable on June 30, 1979, and a nonrecourse interest bearing note for $10,225,875 with a maturity date of June 30, 1986.

The acquisition agreements for "Grease," "Foul Play," and "Bad News Bears Go to Japan" ("Bears 3") were dated May 25, 1978. The total purchase price of "Grease" was $8,179,600: $25,000 payable contemporaneously with execution of the acquisition agreement, a recourse promissory note for $1,201,940 with a maturity date of June 30, 1978, a similar note for $817,960 payable on June 30, 1979, and a nonrecourse interest-bearing promissory note for $6,134,700 with a maturity date of June 30, 1986. The total purchase price of "Foul Play" was $6,695,000: $25,000 payable contemporaneously with execution of the acquisition agreement, a recourse promissory note for $979,250 with a maturity date of June 30, 1978, a similar note for $669,500 payable on June 30, 1979, and a nonrecourse interest-bearing promissory note for $5,021,250 with a maturity date of June 30, 1986. The total purchase price of "Bears 3" was $5,682,300: $25,000 payable contemporaneously with execution of the acquisition agreement, a recourse promissory note for $827,345 with a maturity date of June 30, 1978, a similar note for $568,230 payable on June 30, 1979,

---

[6]Use of terms such as "recourse" and "nonrecourse" in connection with promissory notes should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved.

and a nonrecourse interest bearing promissory note for $4,261,725 with a maturity date of June 30, 1986.

Balmoral Associates, Ltd. (Balmoral), is an Illinois limited partnership of which Capital B and Mr. Filler are the general partners. Balmoral purchased "First Love" and "The One and Only" from FWC. The private placement memorandum describes "First Love" as:

a bittersweet, tender love story set on a contemporary college campus and told from a woman's point of view. A young man of a decidedly romantic temperament meets the girl of his dreams, but she turns out to be far more worldly than he anticipates. Played out on campus and in the girl's lavish family mansion, the couple's ensuing love affair eventually dissolves as a result of her persistent attraction to an older, married man.

This motion picture, based upon a short story by Harold Brodkey, was produced by Larry Turman ("The Graduate", "The Great White Hope", "The Best Man" and "The Flim Flam Man") and directed by Joan Darling. "First Love" stars Susan Dey (star of the successful television series "Partridge Family") and William Katt ("Carrie"). * * *

"The One and Only" is described in such memorandum as:

a funny and tender story which gives the audience a glimpse into the life and romance of Gorgeous George as a young man. This motion picture climaxes when George dons a fur-trimmed gold robe and blond wig with a hairnet and enters the Madison Square Garden wrestling arena to thunderous applause.

This motion picture was produced and written by Steve Gordon and directed by Carl Reiner ("Oh, God!" and "Where's Poppa?"). * * * [It] stars Henry Winkler, television's "Fonzie". * * *

For convenience, "First Love" and "The One and Only" will sometimes be referred to as "Balmoral's motion pictures" or "the Balmoral motion pictures."

Shelburne Associates, Ltd. (Shelburne), is an Illinois limited partnership of which Capital B and Mr. Filler are the general partners. The private placement memorandum contained the following descriptions of the four motion pictures purchased by Shelburne from FWC:

(a) "Grease".

"Grease", the film version of the longrunning show, is a musical celebration of rock and roll in the Fifties with a cast including John Travolta ("Saturday Night Fever"), Olivia Newton-John and Stockard Channing.

This motion picture was produced by Robert Stigwood Organization and was directed by Allen Carr. * * *

(b) *"Heaven Can Wait"*.

"Heaven Can Wait", a remake of the 1949 original film starring Gene Tierney and Don Ameche, is a comedy fantasy about a famous football player who dies before his time and is given the ultimate comeback, a chance to return to Earth.

This motion picture was produced by Warren Beatty ("Shampoo" and "Bonnie and Clyde") and directed by Warren Beatty and Buck Henry, with screenplay by Elaine May. "Heaven Can Wait" stars Warren Beatty, Julie Christie, James Mason and several other prominent artists. * * *

(c) *"Bad News Bears Go To Japan"*.

Following the two preceding popular Bad News Bears pictures, "Bad News Bears Go To Japan" picks up the team of sandlot youngsters on their way from Los Angeles to the Orient, raising havoc with the American pastime.

This motion picture was produced by Michael Ritchie, directed by John Berry and stars Tony Curtis with the Bad News Bears team. * * *

(d) *"Foul Play"*.

From the creator of "Silver Streak" and "Harold and Maude", "Foul Play" is a comic thriller that brings together on the screen the wacky charms of Goldie Hawn and Chevy Chase.

This motion picture was produced by Thomas L. Miller and Edward K. Milkis and directed by Colin Higgins. * * *

For convenience, "Grease," "Heaven Can Wait," "Bears 3," and "Foul Play" will sometimes be referred to as "Shelburne's motion pictures" or "the Shelburne motion pictures."

The purchase agreements by which the partnerships acquired the films from FWC were signed by Mr. Filler as the representative of the relevant partnership. Each of the purchase agreements was nearly identical to the corresponding agreement by which FWC acquired the film. The only relevant differences were that the purchase agreements did not mention the purchase of errors and omissions insurance and that the financial terms differed. The consideration paid by Balmoral for "First Love" was $2,571,000: $10,000 payable upon execution of the purchase agreement, $130,000 payable on December 1, 1977, $259,000 payable on or before June 30, 1978, and a recourse 8-percent interest-bearing promissory note for $2,172,000 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's

gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals ONE MILLION FIVE HUNDRED THOUSAND ($1,500,000) and said distributor's gross receipts from all other territories equals ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000), and shall become and be without recourse as to the full extent thereof when said distributor's worldwide gross receipts equals FIVE MILLION DOLLARS ($5,000,000). In all events the entire note shall become nonrecourse to the full extent thereof upon a licensing of the syndicated television exhibition rights of the PICTURE and receipt by the said distributor of the sum due to it upon the first syndicated television broadcast of the PICTURE.

The consideration paid by Balmoral for "The One and Only" was $4,870,000: $212,000 payable on or before December 20, 1977, $403,500 payable on or before June 30, 1978, $227,000 payable on or before June 30, 1979, and a recourse 8-percent interest-bearing promissory note for $4,027,500 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals THREE MILLION FIVE HUNDRED THOUSAND DOLLARS ($3,500,000) and said distributor's gross receipts from all other territories equals THREE MILLION FIVE HUNDRED THOUSAND ($3,500,000), and shall become and be without recourse as to the full extent thereof when said distributor's worldwide gross receipts equals ELEVEN MILLION DOLLARS ($11,000,000). In all events the entire note shall become nonrecourse to the full extent thereof upon a licensing of the syndicated television exhibition rights of the PICTURE and receipt by the said distributor of the sum due to it upon the first syndicated television broadcast of the PICTURE.

The consideration paid by Shelburne for "Heaven Can Wait" was $12,734,500: $10,000 payable on or before December 20, 1977, $1,014,000 payable on or before June 30, 1978, $1,484,625 payable on or before June 30, 1979, and a recourse 8-percent interest-bearing promissory note for $10,225,875 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals TEN MILLION DOLLARS ($10,000,000) and said distributor's gross receipts from all other territories equals SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000), and shall become and be without recourse as to the full extent thereof when said distributor's worldwide gross receipts equals TWENTY FIVE MILLION DOLLARS ($25,000,000). In all events the entire note shall become nonrecourse to the full extent thereof upon receipt by the said distributor of more than $1,500,000 from the television exhibition of the PICTURE and the exhibition of the PICTURE on free home television.

The consideration paid by Shelburne for "Grease" was $8,429,600: $25,000 payable upon execution of the purchase agreement, $1,352,000 payable on or before June 30, 1978, $917,900 payable on or before June 30, 1979, and a recourse 8-percent interest-bearing promissory note for $6,134,700 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals ELEVEN MILLION DOLLARS ($11,000,000) and said distributor's gross receipts from all other territories equals FOUR MILLION DOLLARS ($4,000,000), and shall become and be without recourse as to the full extent thereof when said distributor's gross receipts from the United States equals SIXTEEN MILLION DOLLARS ($16,000,000) and said distributor's gross receipts from all other territories equals FOUR MILLION DOLLARS ($4,000,000). In all events the entire note shall become nonrecourse to the full extent thereof when said distributor's gross receipts from other than theatrical sources equal or exceed SIX MILLION FIVE HUNDRED THOUSAND DOLLARS ($6,500,000).

The consideration paid by Shelburne for "Foul Play" was $6,845,000: $25,000 payable upon execution of the purchase agreement, $1,079,250 payable on or before June 30, 1978, $719,500 payable on or before June 30, 1979, and a recourse 8-percent interest-bearing promissory note for $5,021,250 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals NINE MILLION DOLLARS ($9,000,000) and said distributor's gross receipts from all other territories equals TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000), and shall become and be without recourse as to the full extent thereof when said distributor's gross receipts from the United States equals TWELVE MILLION DOLLARS ($12,000,000) and said distributor's gross receipts from all other territories equals THREE MILLION DOLLARS ($3,000,000). In all events the entire note shall become nonrecourse to the full extent thereof when said distributor's gross receipts from other than theatrical sources equal or exceed FOUR MILLION DOLLARS ($4,000,000).

The consideration paid by Shelburne for "Bears 3" was $5,782,300: $25,000 payable upon execution of the purchase agreement, $887,345 payable on or before June 30, 1978, $608,230 payable on or before June 30, 1979, and a recourse 8-percent interest-bearing promissory note for $4,261,725 with a maturity date of June 30, 1986. The purchase agreement provided that such:

note shall become and be without recourse to the extent of fifty percent (50%) of the original principal amount thereof when the distributor's gross receipts (as defined in the distribution agreement relating to PICTURE to be entered into by PURCHASER and when said distributor accounts to PURCHASER therefore) from the distribution in the United States equals SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000) and said distributor's gross receipts from all other territories equals TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000), and shall become and be without recourse as to the full extent thereof when said distributor's gross receipts from the United States equals TEN MILLION DOLLARS ($10,000,000) and said distributor's gross receipts from all other territories equals TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000). In all events the entire note shall become nonrecourse to the full extent thereof when said distributor's gross receipts from other than theatrical sources equal or exceed SIX MILLION DOLLARS ($6,000,000).

Promissory notes and other obligations due before 1986 will sometimes be referred to as short-term notes and will sometimes be identified by payor. Promissory notes due in 1986 will sometimes be referred to as long-term notes and

will sometimes be identified as recourse or nonrecourse and by payor.

The purchase agreements for all the motion pictures had a guaranty paragraph. For "First Love" and "The One and Only," Balmoral had to "secure guarantees of 50% of the principal amount of PURCHASER'S note to SELLER on a prorata basis from each of its limited partners." For "Grease," "Foul Play," and "Bears 3," Shelburne had to secure the guarantee of 97 percent of such principal amount, and for "Heaven Can Wait," 100 percent had to be guaranteed.

The security agreements executed between FWC and the partnerships incorporated the following clause:

12A. *Distribution Agreement.* The Secured Party acknowledges that Debtor shall be granting certain rights and licenses with respect to the Photoplay pursuant to a distribution agreement including, without limitation, certain distribution rights and fees and the right to recoup certain advances, and that the security interest granted hereby shall be in all respects subordinate and junior to the rights granted in said distribution agreement. Nothing contained herein and no action taken by the Secured Party hereunder shall affect or diminish such rights of the distributor under said distribution agreement.

The distribution agreement, dated November 2, 1977, by which Balmoral granted certain rights in "First Love" to Paramount, provided in pertinent part:

1. DISTRIBUTION RIGHTS AND PERIOD: Partnership does hereby irrevocably grant and license to Paramount its successors and assigns under copyright and all renewal or extended copyrights the exclusive right and privilege, during the term hereof, and for the Paramount Territory to distribute, exhibit, market, re-issue and otherwise exploit, and to license and permit others to distribute, exhibit, market, re-issue and otherwise exploit, the Picture and the literary, and dramatic material contained in the Picture (but only as embodied therein) and all other rights, properties and interests therein and thereto to the extent owned by Partnership * * * and to make any changes, eliminations or additions thereto, as Paramount may determine.

All references herein to the "Paramount Territory" shall be deemed to refer to the entire world.

The distribution rights herein granted to Paramount shall include, without limitation, the right to distribute or exploit the Picture by means of so-called free television and/or pay or subscription television, community antennae television systems, cassettes, cartridges, tape or electronic visual recording systems, and in any other method or means for the exhibition, performance or exploitation of the Picture theatrically, non-

theatrically in any and all gauges, forms and procedures and/or by means of television or any similar process or in any other fashion or through any other medium whatsoever whether now known or hereafter devised and in all languages. The music rights licensed hereunder shall be subject to the conditions contained in the licenses relating thereto.

The term of this Agreement is

(a) a period of twenty-eight (28) years commencing from the date hereof and,

(b) thereafter and in perpetuity for successive additional periods of twenty-eight (28) years,

provided, however, that in the event the proceeds payable to Partnership under subparagraph 3 FOURTH of this Agreement shall have attained the sum of $5 million prior to the commencement of any of the additional periods described in (b) hereof, Paramount agrees to pay Partnership upon the date of commencement of any said additional twenty-eight (28) year period, the sum of Five Thousand Dollars ($5,000) or the then fair-market value of the Picture, whichever is the greater, which sum shall constitute an advance against any further sums which thereafter may become due and payable to Partnership pursuant to subparagraph 3 FIFTH of this Agreement. Paramount's failure to make such payment shall not divest Paramount of its right to extend and to be deemed to have extended the term hereof for said additional period unless and until Partnership shall have given Paramount, by prior written notice * * * sixty (60) days within which to elect not to extend for said additional period and Paramount shall not have tendered payment to Partnership of said consideration on or before the expiration of the said sixty (60) day period. In the event the proceeds payable to Partnership under subparagraph 3 FOURTH of this agreement shall not have attained the sum of $5 million at the time of the commencement of any of the additional periods described in (b) hereof, Paramount shall have extended and shall be deemed to have extended said rights for said additional period and no consideration shall then be due and payable from Paramount to Partnership for the extension of said additional period; however, during any said additional period if and when the proceeds payable to Partnership under subparagraph 3 FOURTH of this Agreement shall have attained the sum of $5 million, then the aforesaid advance of $5,000 or the then fair-market value of the Picture, whichever is the greater, shall be due and payable in consideration of the extension of the term hereunder and for the remainder of the then additional period but Paramount shall not be in default for failure to pay same until and unless notice thereof shall have been given by Partnership in the manner aforestated.

*      *      *      *      *      *      *

2. * * *

(c) * * *

Paramount * * * may make outright territorial grants covering the distribution of the Picture in any part of the Paramount Territory without limitation, whether or not Paramount * * * shall there maintain

its own exchanges, provided, however, that it shall not make any "outright sale" with respect to the theatrical distribution of the Picture in the United States or Canada. * * *

(e) Paramount agrees to cause the Picture to be released in the countries of the Paramount Territory as soon as reasonably practicable consistent with Paramount's policies regarding release in any such country, * * *

\* \* \* \* \* \* \*

3. THEATRICAL AND PAY TELEVISION DISTRIBUTION FEES: U.S.A. AND CANADA 30% UNITED KINGDOM 35% REST OF WORLD 40% TERRITORIAL GRANTS 10% FREE TELEVISION DISTRIBUTION FEES: U.S.A. NETWORK SALES 25% U.S.A. SYNDICATION AND CANADA 35% REST OF WORLD 40%

For all other gross receipts, distribution fees will be the same as theatrical for the applicable territory.

The gross receipts (as defined in Paragraph 2 hereof) shall be apportioned in the following order:

FIRST: (a) Partnership shall receive a sum equal to one and three-quarter (1¾%) percent of gross receipts until such time as the Partnership shall have been paid pursuant to subparagraph FOURTH below an amount equal to the sum of $2,496,000, plus interest thereon at the rate of 8% per annum commencing on the date hereof when, Partnership thereafter shall receive a sum equal to three (3%) percent of gross receipts derived thereafter. * * * [Union and guild costs are to be deducted prior to computing sums payable to the Partnership.]

(b) Paramount shall retain a sum equal to gross receipts multiplied by appropriate distribution fees as set forth above.

SECOND: Thereafter, Paramount shall recoup and reimburse itself for a sum equal to all of its distribution advances paid or incurred by Paramount * * *

THIRD: Thereafter, there shall be deducted from gross receipts the total of all sums due and owing to such persons, firms and/or corporations other than Partnership and Paramount to whom deferred compensation and/or participations in gross receipts by way of deferred compensation or otherwise are owing by reason of contractual commitments to them in connection with the acquisition of rights and rendition of services for the Picture. * * *

FOURTH: Thereafter, 100% of remaining gross receipts shall be paid to Partnership until Partnership has been paid the sum of $2,848,941, together with interest thereon at the rate of 8% per annum commencing on the date hereof.

FIFTH: Thereafter, any gross receipts remaining shall be apportioned as follows: Partnership—sums equal to 15% thereof, Paramount—sums equal to 85% thereof. In the event either Paramount or Partnership gives up or assigns to any third party a share of any amounts payable hereunder, such share shall be payable wholly out of said respective party's share if and when such share becomes available in accordance with the terms of this Agreement.

\* \* \* \* \* \* \*

4. On or before December 1, 1977, Partnership will pay Paramount $300,000, which sum will be used to pay the advertising costs hereunder, which costs shall be deemed paid by Partnership. Promptly after said sum has been expended Paramount shall provide Partnership with a statement showing the manner in which said sum was so expended.

\* \* \* \* \* \* \*

6. \* \* \*

(h) \* \* \* Paramount has obtained customary Errors and Omissions Insurance with Firemans Fund pursuant to Paramount's blanket policies, such coverage to be for the benefit of Paramount and Partnership as their interests may appear. \* \* \*

\* \* \* \* \* \* \*

7. (a) Partnership agrees to defend, indemnify and hold harmless Paramount, its assignees and licensees, against any charges, damages, costs, and expense, \* \* \* whatsoever, which may be sustained or suffered by or secured against them by reason of, or based upon or relating to a breach of any of Partnership's representations, warranties or agreements contained herein or in the exercise or attempted exercise of any of the rights, licenses or privileges herein granted \* \* \*

8. Contemporaneously herewith, Partnership shall deliver the Picture to Paramount by delivering the items specified \* \* \* to such laboratory as Paramount may designate. Such laboratory shall have the sole and exclusive right to possession and custody of the material to be delivered hereunder \* \* \* during the entire period of Paramount's exclusive distribution hereunder. Partnership shall furnish Paramount with a Letter of Irrevocable Authority in Paramount's customary form of Laboratory Agreement to the laboratory Paramount designates so that Paramount and/or its subsidiary or affiliates shall be the only ones exclusively entitled to order prints or deal with any of the materials deposited therein with respect to the Picture. Paramount shall pay all storage costs and all costs for material ordered by it and shall hold Partnership harmless with respect thereto. Notwithstanding the above, Partnership will have access to the material deposited therein for the sole purpose of inspecting said material. Partnership shall not remove any of said material from the laboratory.

9. (a) As between Partnership and Paramount, Paramount shall have the right to determine the title under which the Picture shall be released \* \* \*

(b) Partnership shall have the right to advise and consult with Paramount with respect to the opening advertising and publicity campaign and the initial theatrical release of the Picture in the United States and Canada, and Paramount agrees to give good faith consideration to Partnership's suggestions and advice, but Paramount['s] decision in such matters shall be final.

(c) \* \* \* Paramount shall have the right \* \* \* to use and license the use of all material upon which the Picture was based or from which it was adapted, \* \* \* subject, however, to the agreements between the

producer of the Picture and such artists, authors and others appearing in or connected with the Picture.

        \*        \*        \*        \*        \*        \*        \*

11. If any person, firm or corporation shall do or perform any acts which Paramount believes constitute a copyright infringement of the Picture or of any \* \* \* material contained in the Picture, \* \* \* or violate or infringe any right of Partnership or Paramount therein or if any person, \* \* \* shall do or perform any acts which Paramount believes constitute an unauthorized or unlawful distribution, exhibition, or use thereof, then and in any such event, Paramount may and shall have the right to take such steps and institute such suits or proceedings as Paramount may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, \* \* \* . Paramount may take such steps or institute such suits or proceedings in its own name or in the name of Partnership or in the names of the parties jointly, and Paramount is hereby appointed and constituted the lawful attorney-in-fact of Partnership to do all acts and things permitted or contemplated by the terms of this paragraph. \* \* \*

        \*        \*        \*        \*        \*        \*        \*

13. All the rights in the Picture (including the copyright therein and negative thereof) excluding the rights herein granted to Paramount, are reserved to Partnership.

14. (a) Partnership hereby grants to Paramount for the term hereof, \* \* \* the exclusive worldwide perpetual publication, performing, recording (including without limitation "original soundtrack album"), synchronization and all other rights in all musical compositions written for or used in or in connection with the Picture. Paramount may license any and all of such rights \* \* \* to any other music publishing company of its choice \* \* \* .

(b) \* \* \* If Paramount grants record rights to any record company, Paramount shall endeavor to obtain the best available royalties in good faith negotiation with such record company, and in any event shall obtain not less than the following royalties:

        \*        \*        \*        \*        \*        \*        \*

15. \* \* \* Paramount shall have, during the term hereof, the sole and exclusive merchandising rights in all stories, characters and objects, things and incidents described or appearing in the Picture, \* \* \* . Without limiting the foregoing, merchandising rights shall include publication rights in novelizations of the screenplay and other publication rights to the extent acquired.

16. (a) Partnership agrees to accept Paramount's usual and normal methods of accounting, which Paramount agrees will be in accordance with generally accepted accounting principals [sic] and practices in the motion picture industry. Partnership shall have the right to inspect and audit in New York, Paramount's home office distribution records relating to the Picture, customarily maintained in New York, but not more frequently than once in any year, nor for any period previously audited or

more than two (2) years prior to the date of any such audit. Any such audit must * * * be completed within thirty (30) days after Paramount shall have made said distribution records available to Partnership or its representative. * * * Partnership agrees to accept, and Paramount agrees to provide statements quarterly for the first two (2) years following general release of the Picture, semi-annually for the third year, and annually thereafter so long as the Picture is in active distribution. Such statements shall be provided within 90 days of the close of the accounting period in question. Such statements may be on a billings or collection basis, and Paramount shall have the right to change the method from time to time. In the event a statement is on a billings basis, Paramount shall have the right in subsequent statements to make adjustments for uncollected bills.

*    *    *    *    *    *    *

(c) In preparing and filing their tax returns, Paramount and Gulf & Western Industries, Inc. and their distributing subsidiaries shall have the sole right to take the full amount of whatever credits, deductions or other benefits that may be available to them throughout the world with respect to, or relating to, taxes and fees paid by them in connection with distribution of the Picture, and Partnership shall not have the right to share or participate in or to take any such credits, deductions or other benefits as aforesaid.

*    *    *    *    *    *    *

18. (a) Partnership may assign its share of the receipts from the Picture provided that written notice of such assignment shall be promptly given to Paramount and that Paramount shall not be required or obligated to make payments or disbursements directly to more than two such assignees at any one time. Except as herein provided, Partnership shall not assign this Agreement without the written consent of Paramount.

(b) * * * Nothing contained herein shall be deemed or construed to limit or prevent Paramount from assigning or hypothecating all or a portion of its share of the revenues derived hereunder, or as prohibiting or preventing Paramount from causing the Picture to be distributed in whole or in part through sub-distributors, selling agents or licensees, * * * except as otherwise specifically provided in this Agreement.

19. Paramount may add titles to the Picture and to any publicity or advertising issued in connection therewith, indicating Paramount's and/or its parent's names, brands or trademarks and containing words, such as, "PARAMOUNT PRESENTS", "A PARAMOUNT PICTURE", "PARAMOUNT PICTURES", etc., as Paramount determines.

*    *    *    *    *    *    *

21. * * * Paramount shall have the right to select from the Picture such material as Paramount may desire for deposit in Paramount's stock film library without any compensation to Partnership for material so selected. Any material so selected shall forever be and remain

Paramount's sole and exclusive property and Paramount shall have the right to use such footage or make such footage available to others in any motion picture photoplays and any considerations received by Paramount from others shall belong to Paramount exclusively.

Such agreement was signed by Mr. Filler on behalf of the partnership and called for theatrical exhibition to commence no later than November 25, 1977.

The distribution agreements for the other films were nearly identical to the "First Love" distribution agreement. The only relevant differences were some variations in dates of execution and exhibition, payment for advertising costs, apportionment of gross receipts, and time limits for financial statements. Such agreements for "The One and Only" and "Heaven Can Wait" were dated December 2, 1977, and theatrical exhibition was to commence on April 15, 1978, and July 1, 1978, respectively. Under the distribution agreement for "The One and Only," Balmoral was to pay Paramount $450,000 on or before June 30, 1978, for advertising costs, and the gross receipts were to be apportioned as follows:

FIRST (a) Partnership shall receive a sum equal to one and three-quarter (1¾%) percent of gross receipts until such time as the Partnership shall have been paid pursuant to subparagraph FOURTH below an amount equal to the sum of $4,770,000 * * *

\* \* \* \* \* \* \*

FOURTH: Thereafter, 100% of remaining gross receipts shall be paid to Partnership until Partnership has been paid the sum of $5,275,618 * * *

FIFTH: Thereafter, any gross receipts remaining shall be apportioned as follows: Partnership—sums equal to 25% thereof, Paramount—sums equal to 75% thereof, provided, however, that in no event shall Partnership's said 25% share be less than such sums as would have been payable to it hereunder if participations in net profits were not deductible * * * and Partnership's share of the remaining gross receipts pursuant to this subparagraph FIFTH were 11% and if Partnership's said 25% share shall be so less, Paramount shall additionally pay to the Partnership on a continuing basis an amount equal to the sums by which it is so less.

The distribution agreement for "Heaven Can Wait" required Shelburne to pay Paramount $825,000 on or before June 30, 1978, for advertising costs, and the variations in the apportionment of gross receipts were as follows:

FIRST: (a) Partnership shall receive a sum equal to one and three-quarter (1¾%) percent of gross receipts until such time as the Partnership shall have been paid pursuant to subparagraph FOURTH below an amount equal to the sum of $12,534,500 * * *

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

FOURTH: Thereafter, 100% of remaining gross receipts shall be paid to Partnership until Partnership has been paid the sum of $13,464,077 * * *

Additionally, apportionment of remaining gross receipts was substantially the same as set forth for "The One and Only."

The distribution agreements for "Grease," "Foul Play," and "Bears 3" were dated May 25, 1978. The initial exhibition date for "Foul Play" was August 1, 1978, one month after such date for the other films. Such agreements contained no advertising advance payment, but contained the following provision concerning accounting statements provided by Paramount:

16. (a) * * * Such statements shall be provided within 90 days of the close of the accounting period in question, provided, that the first said statement hereunder shall be provided 120 days after the close of the relevant period. * * *

Such agreement for "Grease" required variations in the apportionment of gross receipts as follows:

FIRST: (a) Partnership shall receive a sum equal to one and three-quarter (1¾%) percent of gross receipts (other than those from free home network and syndicated television distribution) until such time as there shall be payable to the Partnership pursuant to subparagraph FOURTH below an amount equal to the sum of $8,179,600 * * * . At such time as the gross receipts are such that the remaining gross receipts payable to the Partnership pursuant to subparagraph FOURTH below and/or to be apportioned pursuant to subparagraph FIFTH below reach the level of $8,179,600 plus interest thereon at the rate of 8% per annum commencing on the date hereof, to the extent that gross receipts from free home network and syndicated television distribution are not necessary for such level of remaining gross receipts to be reached, Partnership shall also be entitled to receive a sum equal to four (4%) percent of such gross receipts from free home network and syndicated television distribution as are not so necessary for said level of remaining gross receipts to be reached, whether derived before or after said level of remaining gross receipts is reached. * * *

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

FOURTH: Thereafter, 100% of remaining gross receipts shall be paid to Partnership until Partnership has been paid the sum of $8,179,600 * * *

FIFTH: Thereafter, any gross receipts remaining shall be apportioned as follows: Partnership—sums equal to 12½% thereof, Paramount—sums equal to 87½% thereof. * * *

The gross receipts provisions of the "Foul Play" agreement were the same as those in the "Grease" agreement, except that the dollar value in the "FIRST" and "FOURTH" subparagraphs was $6,695,000. Similarly, the terms for "Bears 3" were the same except that such dollar value was $5,682,300.

Payments due Balmoral and Shelburne were due with the relevant distribution statement. This timing was standard in the industry and was specifically set forth in the distribution agreements for "Grease," "Foul Play," and "Bears 3".

Pursuant to the distribution agreements, the partnerships sent letters to the movie laboratories directing them to hold for the benefit of Paramount or transfer "any part" of the film and sound material for which Paramount was the distributor. However, the entire film and sound material could only be transferred with the prior written consent of the partnership. All charges for services performed on behalf of Paramount were to be paid by Paramount. Additionally, no one, except the partnership, was to have access to the film and sound material without Paramount's written consent, and no one, including the partnership, could remove such material without Paramount's written consent.

On November 2, 1977, FWC signed two documents, concerning "First Love" and "The One and Only," entitled "Notice of Irrevocable Authority," and Balmoral signed two such notices. The effect of such documents was to allow Paramount to retain the funds due it under the acquisition agreement and thereby to avoid an unnecessary circular flow of money from Paramount to Balmoral, under the distribution agreement, then from Balmoral to FWC, pursuant to the purchase agreement, and finally, according to the terms of the acquisition agreement, from FWC back to Paramount. FWC and Shelburne signed similar documents

for "Heaven Can Wait" on December 2, 1977, and for the other Shelburne motion pictures on May 25, 1978.

On November 2, 1977, Paramount assigned all of its interest in and the copyright of "First Love" to FWC. At the same time, FWC assigned a security interest in "First Love" to Paramount, including:

1. All motion picture rights as more fully set forth in the Acquisition Agreement * * *

2. All common law and/or statutory copyright, domestic and foreign, to be obtained by * * * [FWC] in the Photoplay together with all rights to renew or extend such copyright and the right to sue in either or both Assignor's or Assignee's name for past, present or future infringements of copyright.

On the same day, FWC assigned all of its rights in, and the copyright to, "First Love," subject to the Paramount security interest, to Balmoral. A similar series of documents were executed for each of the films involved herein. Such documents for "The One and Only" and "Heaven Can Wait" were executed on December 2, 1977, and for "Bears 3," "Foul Play," and "Grease" on May 25, 1978. All other relevant ancillary agreements, letters, and promissory notes referred to in the acquisition agreements, the purchase agreements, and the distribution agreements were properly executed.

On June 15, 1978, Paramount agreed to the following modification to the acquisition agreements for the motion pictures acquired by Balmoral and Shelburne:

Paramount hereby acknowledges and agrees that the failure of * * * [FWC] to make due and punctual payment of the Note as a result of any delay by the distributor of the Picture in rendering distribution statements for the first calendar quarter of 1978 and all prior periods, and remitting payments required to be made concurrently therewith, shall not be deemed to constitute a breach of the Sale Agreement or a default under the Security Agreement. Further, Paramount hereby extends the due date of the Note until such time as said statements are rendered and said payments are remitted by the distributor of the Picture, reserving all other of its rights under the Sale Agreement and Security Agreement.

On June 21, 1979, paragraph 1 of each of the distribution agreements was amended by deleting the $5,000 or then fair market value language and inserting in its place a flat $25,000 payment. Such amendments were recommended by

Paramount's counsel as a means of avoiding potential litigation.

The provisions in the purchase agreements between FWC and the partnerships dealing with the partnerships' long-term notes and the conditions under which they would convert from recourse to nonrecourse were the result of the "at-risk" rules contained in the Tax Reform Act of 1976. The guarantees executed by the limited partners were designed to insure maximum tax benefits for the limited partners.

The acquisition and purchase agreements were negotiated with Mr. Heyman representing FWC, and the distribution agreements were negotiated and enforced with him representing Balmoral and Shelburne. He continued to act as the primary negotiator for the partnerships when problems arose concerning Paramount's distribution activities. The major economic and financial reporting terms were negotiated; most other points were the standard terms Paramount employed in such agreements. During the negotiations, Mr. Heyman consulted with Mr. Eisenberg very frequently.

The acquisition, purchase, and distribution agreements for each motion picture were intended to be a package; it was always planned that Paramount would be the distributor of the motion pictures. Indeed, Paramount would not have sold the pictures without receiving the distribution rights. By entering into such packages, Paramount was achieving three objectives: it reduced its financial risk associated with each film, increased its ability to make more films by improved cash-flow, and utilized its distribution organization closer to its capacity.

Mr. Heyman wanted FWC to be perceived in the film community as an important company doing business involving major motion pictures. By acting as the "middleman" between Paramount and the partnerships, FWC was developing an on-going relationship with Paramount and creating the image of a company associated with major motion pictures.

On November 14, 1977, the date appearing on the Balmoral private placement memorandum, there were agreements in principle for network television sales for "First Love," in the amount of $2,000,000, and "The One and

Only," in the amount of $3,800,000. The network television license agreement for "First Love" was finalized in February 1978, and such agreement for "The One and Only" was finalized in June 1978. Network television agreements for "Bears 3" in the amount of $5,500,000, "Grease" in the amount of $6,190,000, and "Foul Play" in the amount of $3,500,000 were agreed to in principle by April 1978. License agreements for syndicated (non-network) television had not been agreed upon prior to the execution of the transaction documents involved herein. In January 1983, Paramount licensed domestic syndication rights to "The One and Only," "Foul Play," and "Grease." By September 1984, Paramount had licensed foreign syndication rights to all the films.

"First Love" was released on November 4, 1977, and "The One and Only" was released on February 3, 1978. The Shelburne motion pictures were released during the summer months of 1978—"Bears 3" on June 2, "Grease" on June 16, "Heaven Can Wait" on June 28, and "Foul Play" on July 19.

The Balmoral private placement memorandum stated that the purchase price of a unit in the partnership was $70,000, payable $30,000 upon subscription, $33,000 payable on June 1, 1978, and $7,000 payable on June 1, 1979. The two post-subscription payments were evidenced by promissory notes. Total capitalization was stated as $2,450,000. Under paragraph 6.5 of article VI of the articles of limited partnership, each limited partner agreed to guarantee partnership obligations up to a value equal to 130 percent of his interest in Balmoral. Pursuant to such paragraph, Mr. Durkin executed a guarantee for "First Love" in the amount of $15,514.50 and a guarantee for "The One and Only" in the amount of $28,768. Such guarantees were delivered by Mr. Filler to FWC. The guarantees included the provisions that:

1. The Guarantor unconditionally and irrevocably guarantees the due and punctual payment of the principal of the [long-term] promissory Note, * * *

2. The Guarantor agrees that this constitutes a guaranty of payment and waives any right to require that any action be brought by the Seller for payment of any amounts due and owing to Seller from the Purchaser with respect to the Picture.

The private placement memorandum for Shelburne was not issued until April 12, 1978. The purchase price of a unit in Shelburne was $316,000, payable $130,000 at the time of execution of the subscription agreement, $125,000 on June 1, 1979, and $61,000 on June 1, 1980. The two post-subscription payments were evidenced by promissory notes. Total capitalization was stated as $11,060,000. Pursuant to paragraph 6.5 of article VI of the articles of limited partnership, each limited partner had to guarantee partnership obligations up to a value equal to 225 percent of such interest.

The Balmoral private placement memorandum contained the following passage:

### COMPENSATION OF GENERAL PARTNERS

The following table itemizes all of the types and estimated amounts of compensation payable to the General Partners. All such items were fixed solely by the General Partners and have *not* been determined by arm's length negotiations:

*Guaranteed Payments*

The General Partners will receive fees in 1977, 1978 and 1979 from the Partnership for their services and expenses in creating the Partnership and this private placement. The General Partners, in turn, will utilize a portion of these fees to pay legal, accounting and other expenses in connection with the organization of the Partnership and this Offering, estimated at $158,500, and the fees of offeree and other representatives, if any. The balance, approximately $300,000, will be divided between the General Partners as follows: $275,000 to Capital B Corporation, and $25,000 to Bernard M. Filler.

$458,500

*Annual Overhead, Administrative and Service Fee*

The General Partners will be entitled to receive an annual overhead, administrative and service fee equal to 2% of the Partnership's cash flow after satisfaction of Partnership obligations for which they will provide the Partnership with office facilities, administrative services and all other indirect expenses not relating to the acquisition of the Pictures and the investment in CC-PE.

No estimate

[Fn. refs. omitted.]

The Shelburne private placement memorandum contained similar provisions. The Shelburne guaranteed payments totaled $2,087,050. Approximately $755,000 would be spent on expenses incurred in connection with establishing the

partnership, negotiating contracts, and preparing the private placement memorandum. Of the remaining payments, $1,332,050, Capital B was to receive $1,282,050 and Mr. Filler was to receive $50,000. These payments were compensation "for their services and expenses relating to this private placement." The annual overhead provision was the same in both private placement memorandums.

Both such private placement memorandums stated that the general partners would sell units only to a person who made a written representation that, inter alia, he had a net worth, exclusive of home, furnishings, and automobiles, in excess of $1 million if he was purchasing one unit, or 50 percent thereof if he was purchasing one-half unit.

The private placement memorandum for Shelburne contained the following statement:

The General Partners have been advised that an agreement has been entered into licensing the network television exhibition of "Foul Play" for two showings in return for a fee of $3,500,000. This picture will be available for telecast three years after theatrical release and payment will be made two-thirds upon the first telecast and one-third upon the second telecast. Network television sales for "Grease" and "Bad News Bears Go To Japan" are currently being negotiated, however, no agreements have been reached.

The Shelburne motion picture purchase agreements required substantial cash outlays by Shelburne before the partnership was fully capitalized. The necessary cash was provided by a loan from the Delta Partnership (Delta). Under the terms of such loan, dated April 5, 1978, Shelburne received $2,135,000: $2,084,000 on or before June 30, 1978, and $54,500 on or before June 30, 1979. Such loan was secured by Shelburne's rights in its four motion pictures and was evidenced by two promissory notes, due June 30, 1986, and bearing 9½ percent interest per year. Additionally, under the loan agreement, Delta received a "bonus payment" in the amount of 10 percent of all worldwide nontheatrical[7] gross receipts received by the distributor of the films. The terms were negotiated by Mr. Eisenberg and Mr. Filler; they were not negotiated at arm's length.

---

[7]Nontheatrical gross receipts are those receipts from exploitation of a motion picture other than in a movie theater.

Delta was a partnership composed of CMS Investors (CMS), with a 95½ percent interest, and Megaventure, with a 4½ percent interest. CMS was owned by partnerships and trusts associated with or for the benefit of members of the law firm or members of their immediate families; persons owning at least a 90-percent interest in CMS also had an interest in Capital B, and partnerships or trusts for the benefit of members of the law firm or their immediate families held 50 percent of the interests in Capital B. Mr. Eisenberg was a member of the law firm for whom several such partnerships or trusts were established. In June 1978,[8] CMS borrowed $2,100,000 from four Netherlands Antilles corporations. The loans carried an interest rate of 9 percent until the due dates in 1980, when the rate increased to 13 percent. Such funds were used by CMS for its capital contribution to Delta. Delta then loaned nearly all of such funds to Shelburne.

Zeeuwse Maatschappij N.V. (Zeeuwse), a Netherlands Antilles corporation, loaned CMS $1,100,000 of the funds which it contributed to Delta. In April 1981, Delta sold Zeeuwse a portion of its interest in its bonus payment for $1,400,000; Delta assigned all its rights in the four films except "its interest in free home network and pay or subscription television, CATV or music royalties."

In the spring of 1978, Mr. Heyman sent Mr. Arney a letter stating that the final cost statement for "The One and Only" indicated a direct cost of $3,096,000, which, with overhead and interest, brought the total cost substantially below the cost warranted by Paramount in the acquisition agreement. In such letter, Mr. Heyman requested the return of the appropriate amount of FWC's initial payment and the appropriate reduction in the purchase price. Paramount agreed, resulting in a $119,250 rebate to FWC and new purchase terms: purchase price of $4,293,000, a recourse promissory note for $87,750 due on December 20, 1977, and a nonrecourse interest-bearing note for $3,669,750 with a maturity date of June 30, 1986. Balmoral received a cash rebate, and corresponding changes were made in the purchase agreement: the consideration was $4,393,000, $92,750

---

[8]The loan agreement with N.V. Zwaluw was executed on Dec. 22, 1978. Such agreement recites that the subject funds were made available to CMS on June 6, 1978.

payable on or before June 30, 1978, and a recourse 8-percent interest-bearing note for $3,669,750 with a maturity date of June 30, 1986.

In 1977, Balmoral made a guaranteed payment of $25,000 to Mr. Filler. From 1977 to 1980, Balmoral made $281,219.06 in guaranteed payments to Capital B: $232,500 in 1977, $34,788.19 in 1978, $7,692.97 in 1979, and $6,237.90 in 1980. Balmoral reported a current deduction for all such payments on its returns for such years, except for $20,000 to Capital B in 1977 which was a syndication cost. Of the guaranteed payments, $4,787.92 of the amount paid in 1978, and all of the amounts paid in 1979 and 1980, were for the annual overhead, administrative, and service fee equal to 2 percent of Balmoral's cash-flow.

Shelburne paid Mr. Filler the $50,000 in guaranteed payments referred to in its private placement memorandum; in 1978, he received $34,000, and in 1979, he received $16,000. Capital B received $1,647,953.31 in guaranteed payments: $855,500 in 1978, $758,392.85 in 1979, and $34,060.46 in 1980. Shelburne reported a current deduction for all such payments, except $58,250 to Capital B in 1978 which was a syndication cost, on its returns. Of the guaranteed payments, $324,342.85 of the amount paid in 1979, and all of the amount paid in 1980, were for the annual overhead, administrative, and service fee equal to 2 percent of Shelburne's cash-flow.

Balmoral paid $160,523.68 in legal fees from 1977 through 1980. The law firm was paid $147,927.98 as follows: $116,576.57 in 1977, $22,554.33 in 1978, $5,377.31 in 1979, and $3,419.77 in 1980. In 1977, $8,040 was paid to Taft & Kaminsky, and $4,555.70 was paid to Friedman & Koven. During the same time period, Balmoral paid $35,806.42 in fees to accountants. Weiss & Co. received $24,759.42 as follows: $12,350 in 1977, $2,250 in 1978, $5,534.42 in 1979, and $4,625 in 1980. Solomon, Finger & Newman was paid $11,047 in 1980. Balmoral deducted all of the payments as professional fees, except for $28,132.27 for 1977. Of such amount, $22,500 was capitalized as organization cost, $4,550 was classified as syndication cost, and $1,082.27 was reported as miscellaneous expenses. Balmoral elected to amortize such organization cost over a period of 60 months

and claimed deductions for amortization expense of $750 for 1977 and $4,500 for each of the years 1978, 1979, and 1980.

Shelburne paid $727,592.67 in legal fees from 1978 through 1980. The law firm was paid $699,171.45 as follows: $451,498.88 in 1978, $239,650.52 in 1979, and $8,022.05 in 1980. In 1978, $20,910 was paid to Taft & Kaminsky, and $7,511.22 was paid to Friedman & Koven. During the same time period, Shelburne paid $74,078 in fees to accountants. Weiss & Co. received $51,448 as follows: $23,500 in 1978, $13,998 in 1979, and $13,950 in 1980. Solomon, Finger & Newman was paid $22,630 in 1980. Shelburne deducted all of the payments as professional fees on its returns for the appropriate year, except for $62,500 paid in 1978. Of such amount, $55,000 was capitalized as organization cost, and $7,500 was recorded as syndication cost. Shelburne elected to amortize such organization cost over a period of 60 months and claimed deductions for amortization expense of $8,250.00 for 1978 and $11,000 for each of the years 1979 and 1980.

Balmoral reported gross receipts of $12,500 for 1977, $1,761,432.95 for 1978, $943,108 for 1979, and $1,336,372 for 1980. Balmoral reported a loss of $2,589,074.12 for 1977, a loss of $2,810,978.90 for 1978, a loss of $22,136.76 for 1979, and ordinary income of $526,380.35 for 1980. Shelburne reported no gross receipts for 1978, and gross receipts of $43,023,941 for 1979 and $3,385,580 for 1980. Shelburne reported a loss of $14,871,963.80 for 1978, ordinary income of $34,247,881 for 1979, and a loss of $3,653,249 for 1980.

For purposes of the investment credit, Balmoral claimed qualified investment of $2,571,000 for "First Love" on its return for 1977, and $4,393,000 for "The One and Only" on its 1978 return. On its return for 1978, Shelburne claimed qualified investment of $12,734,500 for "Heaven Can Wait," $8,429,600 for "Grease," $6,845,000 for "Foul Play," and $4,369,630 for "Bears 3." The amount of qualified investment claimed for each film equaled the stated purchase price of the film by the partnership, except in the case of "Bears 3" where the qualified investment was reduced by the amount of foreign costs incurred to produce the film.

In the "First Love" distribution report for the period ended September 23, 1978, the cost of domestic prints is listed as $274,855 and deferments are stated as $45,000. The distribution report for "The One and Only" for the period ended September 23, 1978, listed additional print costs of $604,011 and deferments of $362,500. Such print costs and deferments were reflected on Balmoral's amended return for 1978. On such return, an increased qualified investment of $1,286,366 was reported. Similar information was reflected on Balmoral's amended return for 1980. On such return, an additional qualified investment of $124,258 for additional prints and deferments was reported, $6,798 of which related to "First Love," and $117,460 of which related to "The One and Only."

Shelburne filed amended returns for 1979 and 1980. The amended return for 1979 reported an additional qualified investment of $6,568,464. This amount included print costs, union and guild payments, deferments, and participations reported in the distribution statements for all of the Shelburne films. The amended return for 1980 reported an additional qualified investment of $591,417.

Balmoral reported depreciation expenses of $1,948,686.88 for 1977, $3,835,819.08 for 1978, $529,614.06 for 1979, and $510,599.98 for 1980 on the appropriate partnership return. These amounts were calculated by applying the income-forecast method using Paramount's gross receipts from the Balmoral motion pictures without including network television rentals. Shelburne reported depreciation expenses of $12,760,822.22 for 1978, $6,123,491 for 1979, and $6,123,491 for 1980 on the appropriate partnership return. On its return for 1978, Shelburne used the double-declining balance method for computing depreciation. For years after 1978, Shelburne used the straight-line method of depreciation with a 4-year useful life.

Capital B engaged a New York accounting firm with expertise in motion picture auditing, Solomon, Finger & Newman, to perform audits of Paramount's distribution records relating to the pictures owned by Balmoral and Shelburne. Review of such audits and followup negotiations with Paramount by Mr. Heyman resulted in the recovery of money, which they would not otherwise have received, by

the partnerships. Additionally, Messrs. Eisenberg and Filler reviewed the distribution statements from Paramount. Such review and the resultant negotiations with Paramount, usually by Mr. Heyman, resulted in the recovery of money by the partnerships.

During 1979, the long-term notes for "Foul Play," "Grease," "The One and Only," and "Heaven Can Wait" converted from recourse to nonrecourse and, consequently, the limited partners' guarantees associated with such motion pictures were canceled and returned to them. On August 19, 1982, Mr. Filler, on behalf of Capital B, informed FWC that the long-term note for "First Love" had converted from recourse to nonrecourse. At such time, the limited partners' guarantees associated with such film were canceled. As of September 1984, despite the fact that such notes converted 2 years before, such notes had not been paid in full. Similarly, the long-term notes associated with "The One and Only" had not been paid in full by September 1984. By such time, the long-term notes for "Grease," "Foul Play," and "Heaven Can Wait" had been paid in full. As of such date, the long-term notes for "Bears 3" had not converted.

After the investors had become partners in Shelburne and the four Shelburne motion pictures had been released, some of such motion pictures were shown privately to the partners and their families by Shelburne at the Edens Theaters in Northbrook, Illinois. Such showings were catered and were held in recognition of the substantial investments made to Shelburne by the investors. Shelburne incurred various expenses in connection with the screenings, including costs for rental of the theaters and catering. Such costs were reported to be $4,859.40 and were deducted as "rent" on Shelburne's 1978 return.

Mr. Grossman has been an accountant for over 24 years. He formed a partnership named Good News Boys (GNB), which invested in the motion picture "Bears 2" by becoming a limited partner in Ambassador Associates. In May 1978, GNB acquired one unit in Shelburne; Mr. Grossman executed all relevant documents on behalf of GNB. GNB received distribution checks from Shelburne in the amounts of $349,156.88 in 1979, $46,254.10 in 1980, $5,690 in 1981,

and $2,220 in 1983. In addition, GNB was relieved of its obligations to pay capital contributions due in June 1979 and June 1980, resulting in constructive dividends of $186,000.

Prior to his receipt of information concerning Balmoral or Shelburne, Mr. Durkin had known Mr. Eisenberg for some time and had been an investor in other partnerships organized by him or the law firm. On December 16, 1977, after reviewing the private placement memorandum, Mr. Durkin subscribed to a one-half unit interest in Balmoral. The purchase price of such one-half unit was $35,000 and was payable in three installments: $15,000 at the time of subscription, $16,500 on June 1, 1978, and $3,500 on June 1, 1979. Promissory notes were executed for the 1978 and 1979 payments. Pursuant to instructions from Balmoral, Mr. Durkin dated documents December 14, 1977. Mr. Durkin received distribution checks from Balmoral in the amount of $4,783.12 in 1978, $5,223.65 in 1979, and $4,235.47 in 1980. He continues to receive such checks. Additionally, he was relieved of his obligation to pay the promissory notes due on June 1, 1979. Such relief resulted in a constructive dividend of $3,500.

Mr. and Mrs. Durkin reported Balmoral partnership losses of $35,877 for 1977, $28,483 for 1978, $307 for 1979, and $0, due to loss carryover, for 1980. They claimed an investment credit for the motion pictures with a cost or basis of $60,874.24 for 1978.[9] Mr. and Mrs. Grossman reported GNB partnership loss of $101 for 1978, income of $38,854 for 1979, and loss of $75,032 for 1980. They claimed an investment credit for qualified investments by GNB with a cost or basis of $89,735 in 1978, $73,560 in 1979, and $14,689 in 1980. In his notices of deficiency, the Commissioner disallowed in full the losses and investment credits claimed by the Durkins and Grossmans.

OPINION

Many persons have invested in partnerships like Balmoral and Shelburne that purchased interests in the negatives of motion pictures. This case has been selected as a test case

---

[9]Mr. and Mrs. Durkin do not claim an investment credit for "First Love" in 1977.

with the hope that it will resolve all the issues involved in the similar cases.

The first issue for decision is whether Balmoral and Shelburne became the owners of their respective motion pictures for purposes of computing allowable depreciation. For the years 1977 and 1978, the Commissioner raised such issue after issuing the notices of deficiency. For the years 1979 and 1980, such issue was raised in the notices of deficiency. Therefore, the Commissioner bears the burden of proof with respect to this issue for the years 1977 and 1978, and the petitioners bear such burden for 1979 and 1980. Rule 142(a), Tax Court Rules of Practice and Procedure.[10]

The Commissioner argues that by virtue of the distribution agreements, Paramount acquired the irrevocable right to exploit the films, throughout the world, for their entire economic lives, if not in perpetuity. As a result of such agreements, the partnerships conveyed to Paramount all substantial rights in the motion pictures, and retained no interest upon which a deduction for depreciation can be based. Therefore, the amount received by the partnerships as a result of Paramount's exploitation of the films was a return of basis, and the excess, if any, was ordinary income. The petitioners contend that the partnerships owned the six motion pictures involved in this case. Such ownership arose through the purchase and acquisition agreements and was retained by the partnerships because the distribution agreements reserved certain critical substantial rights for the partnerships.

Whether the partnerships became the owners of the motion pictures for tax purposes as a result of the transactions involved herein is a question of fact to be determined by reference to the written agreements read in light of the attending facts and circumstances. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981); *Miller v. Commissioner*, 68 T.C. 767, 776 (1977); see *Fields v. Commissioner*, 14 T.C. 1202, 1210-1213 (1950), affd. 189 F.2d 950 (2d Cir. 1951). It is well established that the economic substance of a transaction rather than the form in which it is cast is determinative of its tax

---

[10]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

consequences. See *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and the cases cited therein. Thus, in a number of cases, courts have refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred. E.g., *Helvering v. Clifford*, 309 U.S. 331 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252 (1939); *Law v. Commissioner*, 86 T.C. 1065 (1986); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); *Miller v. Commissioner*, *supra* at 767. "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). It is therefore fundamental that the availability of a depreciation deduction is not predicated on the mere holding of legal title to property but rather upon a capital investment in the property. *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. 336 (1925).

Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. sec. 27 (1976); 17 U.S.C. sec. 202 (1982) (effective Jan. 1, 1978); *Michael Todd Co. v. Los Angeles County*, 57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the former without possession of at least certain of the rights encompassed by the latter is commercially valueless (see *Misbourne Pictures Ltd. v. Johnson*, 189 F.2d 774, 776 (2d Cir. 1951)). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." *Goldsmith v. Commissioner*, 143 F.2d 466, 467 (2d Cir. 1944) (Hand, J., concurring), affg. on other grounds 1 T.C. 711 (1943). With respect to a motion picture, the exclusive rights that comprise the so-called "bundle of rights" that is a copyright are the rights to: produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display still photographs taken from the

motion picture to the public.[11] 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective Jan. 1, 1978). Such rights may be subdivided indefinitely and may be owned and enforced separately. 17 U.S.C. sec. 201(d) (1982) (effective Jan. 1, 1978). The copyright for "First Love" has a 28-year term, and the copyright for each of the other motion pictures has a 50-year term. 17 U.S.C. sec. 24 (1976); 17 U.S.C. secs. 302, 303 (1982).

For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1042-1043 (1986), and the cases cited therein. No sale occurs if the transferor retains substantial proprietary rights in the motion picture. See *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. 642, 653 (1973); *Cory v. Commissioner*, 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956).

An examination of the various written agreements reveals that the partnerships acquired and retained no substantial ownership rights in the motion pictures. Under the acquisition agreements, FWC purportedly obtained from Paramount a copyright, without sequel rights, for each motion picture. FWC purportedly transferred all such rights to the partnerships. The partnerships, according to the distribution agreements, then transferred back to Paramount all of the basic rights associated with a copyright, while retaining a "bare" copyright. For each motion picture, all the documents evidencing such transactions were executed at the same time. This series of transfers resulted in Paramount's having the rights to make copies of the motion pictures, to distribute copies of the motion pictures to the public, to show the motion pictures to the public, and to otherwise exploit any dramatic material contained in the motion pictures. Such rights applied to theatrical exploitation, pay television, video cassettes, and commercial television throughout the world. Such enumerated rights combined with Paramount's retention of motion picture sequel rights provided Paramount with the entire bundle of rights that is a copyright.

---

[11]Such right to display was not given copyright holders by statute before Jan. 1, 1978, and, therefore, does not apply to "First Love." This distinction is not important to our decision in this case.

The transactions also resulted in Paramount's retaining rights and liabilities commonly associated with ownership. Paramount had the right to designate the laboratory that made copies of the motion pictures, and it was to pay all the costs related to storage and the making of copies. It had the right to determine the title of each film and the opening advertising and initial theatrical release of the motion pictures in the United States and Canada. Paramount could sue in its own name for copyright infringement. It was given exclusive worldwide rights to the soundtrack of the films and could license such rights. Paramount could add its name to the picture and related advertising in such phrases as "A PARAMOUNT PICTURE." Paramount could select such material as it desired from the motion pictures for deposit in its stock film library without compensation to the partnership, and such material was to remain Paramount's property in perpetuity. Finally, there is no credible evidence that the partnerships had any control over exploitation of the motion pictures.

Our conclusion that Paramount retained all substantial rights in the motion pictures is further supported by the fact that Paramount retained a significant financial interest in and control over the motion pictures and their proceeds. Paramount held $31,843,050 of FWC's long-term nonrecourse notes from FWC's acquisition of the motion pictures. By virtue of the notices of irrevocable authority, Paramount was able to retain the funds that it would otherwise have paid to the partnerships, that the partnerships would then have paid to FWC, and that FWC would then have paid to Paramount. There was no limit placed on the amount of profit Paramount could receive from its distribution efforts. Additionally, all relevant witnesses agreed that Paramount would not have sold the motion pictures if it could not distribute them. Paramount's financial interest combined with its tremendous control over exploitation of the films clearly indicates that it had all the rights and responsibilities of ownership.

The petitioners argue that the potential payment to be made by Paramount to the partnership at the end of every 28-year period in order to extend the distribution agreement is a "renewal price" indicative of the partnership's owner-

ship of its respective motion picture because Paramount had to make a payment every 28 years for the privilege of distributing such motion picture. We conclude that the payments are of little value and thus we disagree. According to the terms of the distribution agreement, Paramount's distribution rights for each motion picture are to last in perpetuity, and at the beginning of each successive 28-year period, if the proceeds payable to the partnership under subparagraph "3 FOURTH" reach $5,000,000, Paramount is to pay the partnership the greater of $5,000 or the fair market value of the motion picture. The payment amount was later amended to a fixed amount of $25,000. Such payments are to be mere advances against further sums payable to the partnership pursuant to subparagraph "3 FIFTH" of the distribution agreement and are only payable upon 60 days' written notice by the partnership. These advances are not, as the petitioners argue, the renewal price for successive 28-year periods of film distribution. Such advances are only a change in the timing of payments and are small when compared to the multimillion dollar cost of each motion picture.

The petitioners contend that several other provisions in the distribution agreements indicate that the partnerships owned more than bare legal title and copyright to each of the motion pictures. The partnerships did not limit their contract remedy to default; the distribution agreements did not preclude a remedy whereby the partnerships could gain physical control over the motion pictures. In prior cases, such a limitation of remedies has been cited by this Court as support for the proposition that a taxpayer did not own a film. E.g., *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. at 645. Additionally, Paramount cannot make an "outright sale" of its rights with respect to theatrical distribution in the United States and Canada. We observe, that while Paramount may not make such outright sale, it may make "outright territorial grants" anywhere in the world, and therefore, the restriction is one of form and not substance. Both of these provisions, under a different set of facts and circumstances, might support a taxpayer's claim of ownership for tax purposes of a film; however, under the facts and circumstances at hand, we conclude that such

provisions, while protecting the petitioners' economic interests created by the transactions under review, simply do not constitute a legitimate claim of ownership.

A deduction for exhaustion and wear and tear is granted to a person who uses property in his trade or business and incurs a "loss resulting from depreciation of capital he had invested." *Helvering v. F. & R. Lazarus Co.*, 308 U.S. at 254. Depreciation "is not predicated upon ownership of the property, but rather upon an investment in property which is thereafter used. * * * The material elements are, the person who makes the investment, use of the property, and the period over which that investment is to be recovered out of income." *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. at 338-339. An income interest dependent on the success of a motion picture may be subject to exhaustion over time in the same way that an investment in the motion picture itself would. *Law v. Commissioner*, 86 T.C. at 1100-1101; *Tolwinsky v. Commissioner*, 86 T.C. at 1053-1054.

The series of transactions between Paramount, FWC, and the partnerships resulted in the partnerships' obtaining a gross receipts participation and a net profits interest in the proceeds of Paramount's distribution efforts. The partnerships' gross participation was 1¾ percent until break-even, and 3 percent thereafter, with some variation for receipts from network and syndicated television for "Grease," "Foul Play," and "Bears 3." The partnerships' net profits interests are set forth in subparagraph "3 FIFTH" of each distribution agreement and range from a minimum of 11 percent to a maximum of 25 percent. As we did in *Law* and *Tolwinsky*, we conclude that such interests will exhaust over time and that, therefore, the partnerships are entitled to an allowance for depreciation.

On its returns for 1977, 1978, 1979, and 1980, Balmoral computed depreciation expense under the income-forecast method by using Paramount's gross receipts, excluding network television rentals, for "First Love" and "The One and Only" in the numerator and denominator. On its return for 1978, Shelburne computed depreciation expense using the double-declining-balance method of depreciation with 3-year useful lives for the motion pictures. For 1979 and

1980, Shelburne used the straight-line method of depreciation with 4-year useful lives. The Commissioner contends that Balmoral must use its own net income in the fraction appearing in the income-forecast method and should include estimates for network television rentals. Concerning the computation of depreciation expense for Shelburne, the Commissioner argues that it was not entitled to use the double-declining-balance method of depreciation for 1978 and that it made unreasonable estimates of the useful lives of the motion pictures in the computations for 1978, 1979, and 1980. The Commissioner contends that a reasonable useful life for the films, given the facts as we have found them, is 8 years. As we are clearly convinced of our conclusions, the burden of proof with respect to the method of computing depreciation is not material.

A contractual right to participate in a motion picture's gross receipts or net profits is an intangible asset. *Law v. Commissioner*, 86 T.C. at 1098-1101; *Tolwinsky v. Commissioner*, 86 T.C. at 1046-1053. Section 167 prohibits use of the double-declining-balance method to compute the allowable depreciation expense for intangible property, but allows the use of the straight-line method for such property. Generally, a change in a taxpayer's method of computing depreciation requires the consent of the Commissioner. Sec. 1.167(e)-1(a), Income Tax Regs.; see sec. 446(e). However, subject to certain limitations not applicable to this case, a taxpayer may change without the consent of the Commissioner from the declining-balance method of depreciation to the straight-line method at anytime during the useful life of the asset. Sec. 1.167(e)-1(b), Income Tax Regs. Additionally, the straight-line method of depreciation is to be used in all cases where the taxpayer has not adopted a different acceptable method of computing the depreciation expense of a depreciable asset. Sec. 1.167(b)-1(a), Income Tax Regs.

The income-forecast method requires the application of a fraction, the numerator of which is income from the motion picture for the taxable period, and the denominator of which is the estimated total income from the motion picture during its useful life. The cost of the motion picture is multiplied by such fraction to calculate the depreciation

allowed for such taxable period.[12] Rev. Rul. 60-358, 1960-2 C.B. 68 (pertaining to television films), amplified to include motion pictures, Rev. Rul. 64-273, 1964-2 C.B. 62. For such method, the term "income" means the taxpayer's net, rather than gross, income. *Gordon v. Commissioner*, 766 F.2d 293 (7th Cir. 1985), affg. a Memorandum Opinion of this Court; *Fife v. Commissioner*, 82 T.C. 1, 9 (1984); *Greene v. Commissioner*, 81 T.C. 132 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 693 (1982). When the taxpayer elects to compute depreciation by use of the income-forecast method, he must use the method as prescribed by the Commissioner. *Greene v. Commissioner*, 81 T.C. at 139.

The petitioners call upon the Court to overrule a series of recently decided cases which clearly hold that when computing depreciation expense under the income-forecast method, the taxpayer must use his net income. They claim that consistent use of Paramount's gross receipts more accurately reflects the stream of income to the partnerships. However, the petitioners then go on to say:

> As the record shows, in order to calculate the *net* income from a film considerable information and analysis is required. In accordance with various agreements, there are numerous expenses and deductions from distributor's gross receipts, including participations, deferments, union and guild payments, prints, advertising expenses, etc., which must be taken into account to calculate net receipts. Accordingly, in order to determine net receipts, Weiss needed all such other expense and deduction information which information simply was *not* available at that time. * * * [Emphasis in original; fn. refs. omitted.]

Additionally, they argue that the use of gross receipts is more directly related to the actual depreciation of a motion picture.

During the years in question, Balmoral owned contract rights to funds derived from the commercial exploitation of two motion pictures. The actual depreciation of such motion pictures is not directly related to the appropriate depreciation expense of such contract rights. This proposition is clearly stated by the petitioners when they point out the

---

[12] $\dfrac{\text{Taxable period income}}{\text{Estimated total income}} \times \text{cost} = \begin{array}{c} \text{Depreciation} \\ \text{allowed} \end{array}$

The estimated income from the activity cannot be less than the sum of the investors' actual cash outlay plus any indebtedness, whether recourse or nonrecourse. Rev. Rul. 60-358, 1960-2 C.B. 68; Rev. Rul. 78-28, 1978-1 C.B. 61.

numerous adjustments to gross receipts which must be made to calculate net receipts. Moreover, the petitioners failed to present any credible evidence that the relevant net receipts information could not be obtained prior to the filing deadlines for the partnership's returns. Therefore, Balmoral's net income should be used in the income-forecast computation.

Balmoral did not include network television rentals in the denominator of the income-forecast fraction. Rev. Proc. 71-29, 1971-2 C.B. 568, states that when using the income-forecast method of depreciation for motion pictures, such as those in question, the taxpayer need not estimate the income from future television exhibition. "However, if an arrangement for domestic TV exhibition is entered into prior to the time the cost of the motion picture has been depreciated to a reasonable salvage value, the Service will require an estimate of income from TV exhibition of such films to be made at that time." Rev. Proc. 71-29, 1971-2 C.B. at 569. The Commissioner contends that estimates for income anticipated from the agreements in principle for network television exhibition of the motion pictures should be included from the time of such agreements in 1977. At a minimum, the Commissioner argues that income estimates from network broadcasting should be included from the time such agreements were formalized by execution of contracts—February 1978 for "First Love," and June 1978 for "The One and Only." The petitioners contend that no estimate need be made until some payment is actually received by Balmoral from the networks because until that time, the amount is too speculative to be included in the denominator. We observe that the petitioners' argument conveniently allows greater early-year depreciation than is allowed by the plain language of the revenue procedure. Further, we observe that the logic of the petitioners' argument would render the income-forecast method useless because all future revenue, including box office receipts, would be considered too speculative. The agreements were with network television stations for motion pictures to be distributed by Paramount, a well known motion picture distributor, and were signed within 6 months of the transactions in question. Therefore, on the facts of this

case, we must agree with the Commissioner that an estimate of income from network broadcasts should be included in Balmoral's income estimate for 1977 and thereafter.

Shelburne could not use the double-declining-balance method of depreciation for 1978, because the contract rights it owned in the motion pictures were intangible. Because it chose an unacceptable method of depreciation, the straight-line method will be used to compute depreciation expense for 1978. Testimony at trial indicates that syndication usually occurs 5½ years after the initial release. The Commissioner's 8-year useful life was based upon the maturity of the long-term notes in 1986; we find such maturity date of no relevance to the useful life of Shelburne's contract rights. Based upon the record as a whole, our best judgment is that 6 years is a reasonable useful life for Shelburne's contract rights.

The next question for our determination concerns the basis of depreciation of Balmoral's and Shelburne's contract rights. In general, the basis of property is the cost of such property. *Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943); secs. 167(g), 1012. When debt principal is payable solely out of exploitation proceeds, nonrecourse loans are contingent obligations and are not treated as true debt. *Estate of Baron v. Commissioner*, 83 T.C. 542, 550-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *Fox v. Commissioner*, 80 T.C. 972, 1022-1023 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-7, 9 (3d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984); *Saviano v. Commissioner*, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985). When a transaction is structured in such a manner, that payment by the taxpayer is not probable, either because of the length or the terms of the debt, the source of the payments, or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. See *Tolwinsky v. Commissioner*, 86 T.C.

at 1048-1050. Such a debt does not reflect an actual investment in property and cannot be included in the taxpayer's depreciable basis. *Siegel v. Commissioner*, 78 T.C. at 684-691; *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

The Commissioner contends that the bases of depreciation in the motion pictures do not exceed $699,000 for "First Love," $1,173,250 for "The One and Only," $3,333,625 for "Heaven Can Wait," $2,294,900 for "Grease," $1,823,750 for "Foul Play," and $1,520,575 for "Bears 3." The Commissioner argues that the long-term notes from the partnerships are not includable in Balmoral's and Shelburne's bases because such notes represent contingent, illusory liabilities and because the purchase price of each motion picture unreasonably exceeded its fair market value. The petitioners state that such notes represent genuine indebtedness and that the purchase price of each motion picture, including the related promissory notes, was not substantially in excess of its fair market value.

The Commissioner contends that the petitioners were not "at risk" for the amount of the purportedly recourse promissory notes maturing in 1986 for which they executed guarantees. He argues that while Mr. Heyman rendered services in negotiating the transactions herein and resolving subsequent disputes, FWC was interjected into such transactions solely to create the appearance of "risk" with respect to such promissory notes. The Commissioner also claims that the events set forth in each purchase agreement whereby the partnership's long-term notes converted from recourse to nonrecourse were certain to occur. Finally, he submits that any amounts payable by virtue of the limited partners' guarantees was too contingent for the at risk rules, and that the possibility of indemnification from the general partner, Capital B, violates the at risk requirements.

The petitioners contend that they were at risk for the entire amount recited in the purchase agreement, including the amount of the notes maturing in 1986. They argue that Mr. Heyman is an independent party to the transactions herein and, on behalf of FWC, stands ready to enforce the guarantees and reap substantial additional profits for FWC.

In support of this position, the petitioners observe that Mr. Barron did not like Mr. Eisenberg, Paramount was very cautious in its business dealings because of a Securities and Exchange Commission investigation, and FWC assumed a large risk even before the partnerships were formed. The petitioners state that the conversion events set forth in the purchase agreements were carefully negotiated by Messrs. Eisenberg and Heyman and were events with a substantial economic relationship to the motion pictures and which demonstrated the requisite degree of economic viability to satisfy the at risk requirements for conversion events. As such, they state that conversion events are similar to examples of bona fide conversion events which appear in the legislative history of section 465. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86 n. 1; H. Rept. 94-658 (1976), 1976-3 C.B. (Vol. 2) 695, 802 n. 10. The Commissioner concedes that he has the burden of proof on this issue for all years except for 1979 for Mr. and Mrs. Durkin.

Given the history of motion picture deals wherein Mr. Heyman and the law firm have worked together, the structure of the transactions in question, the lack of any services by FWC, and the tremendous increase in recourse debt which occurred in the transactions from FWC to the partnerships, this Court concludes that the partnerships' long-term notes and the guarantees of the limited partners were without business purpose and executed solely to gain tax benefits. Therefore, the long-term notes from the partnerships to FWC which mature in 1986 are disregarded for tax purposes. See *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see also *Knetsch v. United States*, 364 U.S. 361 (1960). However, we are persuaded that the amount of the short-term notes from FWC to Paramount is bona fide debt and that the short-term notes from the partnerships to FWC are bona fide, as are the promissory notes of the limited partners to the partnerships.

In support of our conclusion regarding the partnerships' short-term notes, we conclude on the record as a whole that Paramount entered into the transactions in question to receive an early return on its investment in the motion pictures, and it sought to insure this return by the use of recourse notes from FWC and similar notes from the

partnerships to FWC. The existence of the nonrecourse long-term notes from FWC to Paramount underscores Paramount's desire to receive such early return. We are convinced that Paramount would have enforced FWC's short-term notes if the motion pictures had been unsuccessful. In the event of enforcement by Paramount, economic reality would have dictated that FWC would have to enforce the partnerships' short-term notes. Additionally, although the partnerships' short-term notes are for a larger amount than those of FWC, reflecting a markup for Mr. Heyman's services, we conclude that the full amount of the partnerships' short-term notes would have been enforced. By virtue of their promissory notes, the capital contributions of the limited partners would have provided the necessary funds. Compare *Pritchett v. Commissioner*, 85 T.C. 580 (1985) (Court-reviewed) with *Abramson v. Commissioner*, 86 T.C. 360 (1986) (Court-reviewed).

Our conclusion concerning the long-term notes is based in part upon the expectation of the law firm and the petitioners, at the time the parties executed the various relevant agreements, that such notes would convert regardless of the success of the motion pictures. Each of the Balmoral long-term notes convert to nonrecourse upon Paramount's receipt of sums due it upon the first syndicated (non-network) television broadcast of the relevant motion picture. In effect, the conversion to nonrecourse occurs upon the payment of *any* money from *any* local television station. Mr. Heyman stated, as a rule of thumb, that syndication occurs 5½ years after theatrical release of a motion picture. One of the conversion events for "Heaven Can Wait" is the receipt by Paramount of more than $1,500,000 from cable and free home television. Mr. Heyman stated that the cable exhibition of a motion picture will usually commence 18 months after theatrical release. Mr. Arney testified that even a "fairly mediocre" motion picture will generate syndicated television revenues of $1,500,000. "Grease" has gross receipts from other than theatrical sources of $6,500,000 or more as a conversion event. Prior to execution of the FWC-Shelburne purchase agreement for "Grease," there was an agreement in principle to exhibit it on network television for $6,190,000. The motion picture "Foul Play" has Paramount's gross receipts from other than theatrical

sources of at least $4 million as a conversion event. Prior to execution of its purchase agreement, there was an agreement in principle to exhibit "Foul Play" on network television for $3,500,000. "Bears 3" has as a conversion event Paramount's gross receipts of at least $6 million from nontheatrical sources. At the time of execution of its purchase agreement, there was an agreement in principle to exhibit "Bears 3" on network television for $5,500,000. Clearly, the occurrence of the conversion events was, while not certain, very likely.

The conversion events bore little relationship to the ability of the motion pictures to generate sufficient funds to pay off the converted notes. During 1979, partnership notes for "The One and Only," "Foul Play," "Grease," and "Heaven Can Wait" converted to nonrecourse. In 1982, the note for "First Love" converted. Despite the fact that each of these motion pictures was a success, in September 1984, the notes for "The One and Only" and "First Love" remained unpaid. There is no objective evidence in the record that supports the petitioners' contention that the conversion events were bona fide.

The structure of the transactions was designed to produce the appearance of "risk" within the meaning of section 465. The members of the law firm, including Mr. Eisenberg, were experts in tax law and the aspects of the entertainment law relevant to this case. They must have recognized that the partnerships were receiving bare legal title to the motion pictures. Despite this, they structured a series of transactions wherein the partnerships purportedly were at risk to FWC for $41,232,400 when they knew FWC was only at risk for $8,514,050. The larger amount clearly exceeded the fair market value of the rights the partnerships received. This tremendous increase in recourse debt was not the result of arm's-length negotiation; it resulted from the knowledge of Mr. Heyman and the law firm that the limited partners had to be personally liable on the debt in order to reap maximum tax benefits from the transaction. Given the long history of deals between Mr. Heyman and the law firm and the dominant position Mr. Eisenberg held in these transactions, we can only conclude that the transactions were structured with the expectation that the increased purport-

edly recourse debt of $32,718,350 would not be collected if the motion pictures were not successful.

We reach this conclusion even though we are fully aware of Mr. Heyman's statements at trial that he viewed the increase in recourse debt as an opportunity for FWC to make a tremendous amount of money and that he fully intends to enforce such debt for "Bears 3." Such opportunity is to present itself if the long-term notes do not convert to nonrecourse. Under the terms of their guarantees, the limited partners will have to pay the outstanding balance of such notes in 1986. However, FWC may keep the money and allow Paramount to repossess the motion picture. Given the close relationship between Mr. Heyman and the law firm, and the potential dissatisfaction of the limited partners with the law firm resulting from that action, we do not believe his testimony on this point.

We recognize that Mr. Heyman performed many valuable services for the partnerships. However, we conclude that FWC, as distinct from Mr. Heyman, did nothing for the partnerships except create some purportedly recourse debt, and further, we conclude that Mr. Heyman was, for tax purposes, acting as an agent for Capital B and the partnerships throughout the transactions at issue. Mr. Heyman owned WFS, which controlled FWC. Regardless of any unrelated undertakings FWC may have planned, the evidence is clear that, except for a few signatures on agreements, Mr. Heyman was the only representative of FWC in these transactions; he negotiated the acquisition agreements with Paramount, and he acted as chief negotiator for the partnerships when problems arose with Paramount's distribution activities. Prior to the transactions in question, Mr. Heyman had participated in many service company partnerships and negative pickup partnerships organized by the law firm.[13] Indeed, for a period of time, FWC had its office in the same building as the law firm. Mr. Bernstein, the president of FWC in years after the transactions in question were initiated, was involved in other activities with the law firm. In 1980, the law firm disbanded, and FWC ceased functioning in the United States

[13]Mr. Heyman and the law firm were involved in the 1972 transactions at issue in *Estate of Helliwell v. Commissioner*, 77 T.C. 964 (1981).

because Mr. Heyman had divided loyalties following the law firm's breakup.

Paramount desired to deal with Mr. Heyman; they had developed a good working relationship. There was no evidence that Paramount had any desire to deal with FWC. At trial, it was suggested that by selling motion picture rights to a corporation, such as FWC, rather than a partnership, like Balmoral or Shelburne, Paramount avoided the inconvenience of and possible legal problems associated with dealing directly with a limited partnership. Such inconvenience to Paramount arises from frequent contacts by individual limited partners. However, Paramount dealt directly with these same limited partnerships when it entered the distribution agreements. In fact, Paramount's distribution activities were ongoing activities for the partnerships, while the sales to such partnerships would not have been, therefore, Paramount's distribution activities were more likely to produce inquiries by individual limited partners than were direct sales. At trial, Mr. Arney stated that there were no special, important legal problems in dealing directly with a partnership. Therefore, we find this argument unpersuasive.

In summary, we believe the "true" cost of the movies to the partnerships was, except for Mr. Heyman's fee, equal to the cash and short-term notes paid by FWC. The amount represented by the long-term nonrecourse notes of FWC was designed merely to provide a flow of funds to the owner of the motion pictures, Paramount, while providing the appearance of ownership by the partnerships. Finally, the difference between the cash and short-term notes paid by FWC to Paramount and the cash and short-term notes paid by the partnerships is FWC's, more precisely Mr. Heyman's, fee for arranging the transactions and providing certain services in later years. On the record before us, we cannot determine what amount, if any, is currently deductible.

In his notice of deficiency for Mr. and Mrs. Durkin for 1978, the Commissioner disallowed the investment credit attributable to Balmoral. Such notice omitted an explanation for the disallowance. An explanation was provided in the amendment to answer. The Commissioner bears the burden of proving that his determination is correct. Rule

142(a). In the notice of deficiency issued to Mr. and Mrs. Grossman for the year 1978, the Commissioner disallowed all of the investment credit attributable to Shelburne claimed by Mr. and Mrs. Grossman. Mr. and Mrs. Grossman bear the burden of proof on this issue. Rule 142(a). Balmoral claimed additional qualified investment on amended income tax returns filed for 1978 and 1980, and Shelburne made similar claims on amended returns for 1979 and 1980. The petitioners claimed additional investment credits in unstated amounts in their petitions. The petitioners agree that they bear the burden of proof with respect to all additional qualified investment and investment credit.

A taxpayer is entitled to an investment credit under section 48 with respect to a motion picture film only if such film is "new section 38 property"[14] which is a "qualified film"[15] and only to the extent that the taxpayer has an "ownership interest" in such film. Sec. 48(k)(1)(A). A taxpayer may have an ownership interest in a motion picture for purposes of the investment credit even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture. Section 48(k)(1)(C) provides that a taxpayer's ownership interest in a qualified film "shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The existence and extent of an ownership interest is determined at the time the film is placed in service. Sec. 1.48-8(a)(4)(ii), Income Tax Regs.; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. Under section 1.48-8(a)(4)(iii) of the regulations, a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having a depreciable interest for purposes of the investment credit if "he can

---

[14]The Commissioner does not claim that the motion picture films discussed herein are not new sec. 38 property. A motion picture is new sec. 38 property until it is placed in service in any medium of exhibition in any geographical area of the world. Sec. 48(b); sec. 1.48-8(a)(2), Income Tax Regs. A motion picture is placed in service when it is first exhibited or otherwise utilized before the primary audience for which it was created. Sec. 1.48-8(a)(5), Income Tax Regs.

[15]The Commissioner does not dispute that the motion picture films discussed herein are qualified films. A qualified film is defined as "any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature." Sec. 48(k)(1)(B).

look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film."

"It is possible that more than one taxpayer may be entitled to a share of the credit for the same film." S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 230. If a partnership has an ownership interest in a qualified film, its credit is apportioned among the partners on the basis of their percentage of capital at risk in the partnership at the time the film was placed in service. Sec. 1.48-8(a)(4)(iv), Income Tax Regs.

In the instant case, the expenses of producing the motion pictures were incurred by Paramount and were later partially reimbursed by FWC. The payments by FWC consisted of cash and recourse and nonrecourse notes. Such payments were made prior to the motion pictures' being placed in service and were made by FWC acting as agent for the partnerships. At the time of such payments, the partnerships paid cash and recourse and allegedly recourse promissory notes to FWC. Those promissory notes payable in 1986 have been found to be illusory, while the earlier notes are bona fide. The partnerships could look for repayment of such cash and bona fide promissory notes solely from proceeds generated by exhibition or disposition of the motion pictures; they were entitled to no guaranteed payments from Paramount.

The Commissioner contends that the partnerships did not have the required ownership interest in the motion pictures. In support of this contention, he argues that the partnerships transferred all substantial rights in the motion pictures to Paramount and retained no depreciable interest. Additionally, he argues that the partnerships are not lenders or guarantors within the meaning of the relevant regulations. The Commissioner's arguments were made prior to the release of our opinions in *Tolwinsky* and *Law*.

We conclude, that like the partnership in *Law*, Balmoral and Shelburne have satisfied the requirements of section 48(k)(1)(A) and are entitled to be treated as having an ownership interest. Each partnership was a "lender," within the meaning of the relevant regulations, which could look solely to exhibition or disposition of the motion pictures for

repayment. This fact is evidenced by the modification of the acquisition agreements dated June 15, 1978, wherein Paramount agreed that a failure of FWC to make punctual payments on the notes due Paramount would not constitute a breach of such agreements if such failure was due to Paramount's failure to render distribution statements and concurrent payments through the first quarter of 1978. Additionally, our conclusion is supported by subparagraph 3 of the distribution agreements in which all payments to the partnerships are shown to be dependent on motion picture receipts. Compare *Law v. Commissioner*, 86 T.C. at 1106-1113 (ownership interest) with *Tolwinsky v. Commissioner*, 86 T.C. at 1063-1065 (no ownership interest).

The final question raised by the parties concerning the investment credit is the amount of each partnership's share of the production costs of such film. The Commissioner argues that the partnerships' qualified investment is limited to cash and bona fide recourse notes paid by the partnerships to FWC, less the markup attributable to Mr. Heyman's services. Additionally, the Commissioner states that if we determine that advertising costs are not currently deductible, they should be included in such qualified investment amount. The petitioners contend that the amount attributable to such services is includable because the petitioners are at risk for such amount.

The partnership's ownership interest is limited by the qualified U.S. production costs of the film. Such costs do not include fees for negotiations related to selling rights in the motion picture. Sec. 48(k)(5)(B). Therefore, the markup in price by FWC is not part of the production costs; the value of the cash and bona fide recourse notes from FWC to Paramount, less the amount of foreign costs incurred to produce "Bears 3," represents qualified U.S. production costs. We will address the proper classification of the advertising payments below.

On their amended returns, Balmoral claimed increased qualified investment in its motion pictures of $1,286,366 for 1978 and $124,258 for 1980, and Shelburne claimed increased qualified investment in its motion pictures of $6,568,464 for 1979 and $591,417 for 1980. The increases in reported qualified investment were based on print costs,

union and guild costs, deferments, and participations reflected in the distribution reports from Paramount. Domestic prints, deferments, or union and guild costs were the basis of the increase claimed in each motion picture film for at least 1 year. Participations were the basis of such claim for at least 1 year for "Heaven Can Wait," "Grease," and "Foul Play."

An investment credit may be claimed in a year subsequent to that in which the film is placed in service, pursuant to section 1.48-8(e)(9) of the regulations. In relevant part, such regulation states that:

The only costs incurred after a qualified film has been placed in service which are includible in production costs are the cost of preparing prints placed in service within 12 months after the film (or part) is initially released for public exhibition in any medium, residuals described in paragraph (e)(3) of this section,[16] and participations described in paragraph (e)(4) of this section.[17] * * *

Finally, a taxpayer may claim the additional investment credit with respect to such subsequently incurred costs, provided he has an ownership interest in the film at the time such costs are incurred. Sec. 1.48-8(a)(4)(ii), Income Tax Regs.

The Commissioner argues that Balmoral and Shelburne were not at risk with respect to any payments for print costs and union and guild costs. Under subparagraph "3 SECOND" of the distribution agreements, print costs for each film were part of the distribution advances recoupable by Paramount to the extent sufficient gross receipts were earned in excess of the partnership's gross participation and Paramount's distribution fees. Under subparagraph "3 FIRST", union and guild costs are deducted before the partnership's gross participation and Paramount's distribu-

---

[16]These are contingent compensation payments made pursuant to collective bargaining agreements, paid to creative and technical personnel, to their unions, or to pension, health, or welfare funds. The collective bargaining agreements generally cover all films produced over a period of years. Sec. 1.48-8(e)(3), Income Tax Regs.

[17]These are contingent compensation payments paid for the services of actors, production personnel, writers, composers, directors, and producers. These are generally negotiated on a film-by-film basis. Participations may be based on the gross or net income of a film. Sec. 1.48-8(e)(4), Income Tax Regs. Under sec. 1.48-8(e)(5), Income Tax Regs., the inclusion of participations in the credit base may not exceed the lesser of (1) the sum of 25 percent of each participation paid to each person (excluding the amount of any participation exceeding $1 million) for each film placed in service in the year, or (2) 12½ percent of U.S. production costs (other than residuals and participations) of all films placed in service in the year.

tion fees are calculated. Therefore, the costs were not satisfied from funds due the partnerships, and the partnerships were not liable for such costs if the motion pictures did not generate sufficient revenue to cover such costs.

The Commissioner observes that the deferment[18] costs for the Balmoral motion pictures were payable after net profits or a stated amount over break-even was reached and that neither such motion picture had reached either such milestone as of late June 1983. He argues that the petitioners have not shown that such costs were incurred or paid. With respect to the participations and deferments related to "Heaven Can Wait," "Grease," and "Foul Play," the Commissioner concedes that the costs were incurred or paid, because all three films have reached net profits. However, he believes that Paramount and the partnerships should allocate such costs based on their shares of relative risk, as measured by shares of net profits. Shelburne's allocated deferments and participations would be $381,941 in 1979 and $58,574 in 1980.

The petitioners argue that although Paramount paid all print costs and union and guild costs, such costs were actually incurred by the partnerships. The distribution agreements allow Paramount to be reimbursed for such costs prior to certain payments to the partnerships. Therefore, the partnerships, not Paramount, bore the risk of loss resulting from these costs. The petitioners agree with the Commissioner's concession concerning the three Shelburne motion pictures, but only with respect to deferments and participations paid after recoupment by Shelburne of its costs for such pictures.

The petitioners have failed to meet their burden of proof concerning amounts not conceded by the Commissioner. We cannot find that the costs were paid or incurred by the partnerships or someone under their control. Clearly, Paramount paid or incurred the costs in question, and such costs adversely affected the partnerships' income opportunities. It is equally clear that the partnerships did not pay Paramount for incurring such costs. Given that the partnerships did not own the motion pictures, did not distribute

---

[18]Such deferments apparently meet the definition of participations in sec. 1.48-8(e)(4), Income Tax Regs.

such motion pictures, did not determine any of the costs, and, through the workings of the letters of irrevocable authority, only received payments which were net of costs, we conclude that these costs were too remote from the partnerships to be considered paid or incurred by them. In the context of a participation interest, we decline to define "paid" or "incurred" to include the diversion of funds to which the partnerships would have had some right if the underlying cost had not been incurred; the partnerships' interests in the proceeds of the motion pictures were net of these costs. Therefore, the petitioners are not entitled to investment credits beyond the amounts conceded by the Commissioner.

The Commissioner determined that Balmoral and Shelburne were not entitled to deductions in any amount for guaranteed payments to partners. The parties agree that the petitioners have the burden of proof on this issue.

Balmoral claimed deductions for guaranteed payments in the amounts of $237,575 for 1977, $34,988.19 for 1978, $7,692.97 for 1979, and $6,237.90 for 1980. Shelburne claimed deductions arising from guaranteed payments in the amounts of $831,250 for 1978, $774,393 for 1979, and $34,061 for 1980.

Section 707(c) allows a deduction to a partnership for guaranteed payments to partners. Such payments are determined without regard to partnership income and are payments to a partner for services or the use of capital. Sec. 707(c). To be deductible, the guaranteed payments must meet the requirements of section 162(a); they must be ordinary and necessary expenses, reasonable in amount, and incurred in a trade or business.[19] *Wildman v. Commissioner*, 78 T.C. 943, 960 n. 19 (1982); *Cagle v. Commissioner*, 63 T.C. 86, 91 (1974), affd. 539 F.2d 409 (5th Cir. 1976); sec. 1.707-1(c), Income Tax Regs.

In determining whether the payments in the present case are deductible under section 162(a), we look to the nature of the services performed by the general partners rather than

---

[19]Even if the partnerships were not engaged in a trade or business, such payments might be deductible by the partners under sec. 212. Although a partnership is not allowed a deduction under sec. 212, a partnership may incur expenses that may be deducted by an individual partner under sec. 212. Sec. 1.702-1(a)(8)(i), Income Tax Regs.; Rev. Rul. 75-523, 1975-2 C.B. 257.

to their designation or treatment by the partnership. *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179, 187 (1918); *Cagle v. Commissioner*, 63 T.C. at 96. Payments allocable to organizational costs and syndication expenses must be capitalized. Organizational costs, if elected, are amortizable over a 60-month period, but syndication costs are not amortizable. Secs. 263, 709; *Estate of Thomas v. Commissioner*, 84 T.C. 412, 441 (1985), and the cases cited therein; *Estate of Boyd v. Commissioner*, 76 T.C. 646, 658 (1981). The petitioner "bears the burden of proving what portion of the fee is allocable to nondeductible capital portions and to deductible expense portions (*Estate of Boyd v. Commissioner, supra*), and such allocation must reasonably comport with the value of the services performed." *Wildman v. Commissioner*, 78 T.C. at 958; see also *Merians v. Commissioner*, 60 T.C. 187 (1973). Any fee for services to be rendered in the future is not deductible in the year of expenditure. *Estate of Boyd v. Commissioner*, 76 T.C. at 667. Whether payments to a partner represent a reasonable compensation for services is a question of fact to be determined on the basis of the particular circumstances of each case. *Huckins Tool and Die, Inc. v. Commissioner*, 289 F.2d 549 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. When the parties are related, the burden of demonstrating the reasonableness of compensation will not be lightly discharged. *Johnsen v. Commissioner*, 83 T.C. 103, 122 (1984), revd. and remanded on other grounds 794 F.2d 1157 (6th Cir. 1986).

The petitioners argue that the guaranteed payments made to Capital B and Mr. Filler are allowable as ordinary and necessary business expense deductions as compensation for the services rendered by the general partners. In support of this argument, the petitioners refer to the articles of limited partnership which provide that the general partners have full, exclusive, and complete discretion in the management and control of the partnerships. In discharging their duties, the general partners handled all administrative responsibilities of the partnerships. Additionally, the petitioners contend that the general partners undertook many risks on behalf of the partnerships, including liability for short-term notes to FWC.

Balmoral's private placement memorandum stated that the general partners would receive guaranteed payments from Balmoral "for their services and expenses in creating the Partnership and this private placement." Of such fees, approximately $275,000 was to be paid to Capital B and $25,000 was to be paid to Mr. Filler. Concerning guaranteed payments, Shelburne's private placement memorandum stated that Capital B would receive $1,282,050 and Mr. Filler would receive $50,000 "for their services and expenses relating to this private placement." The private placement memorandums of both partnerships stated that the general partners would receive an annual overhead, administrative, and service fee equal to 2 percent of the partnership's cash-flow after satisfaction of partnership obligations.

The plain language of the private placement memorandums clearly establishes that the payments from Balmoral in 1977 and 1978 and from Shelburne in 1978 and 1979, except for those based on the 2 percent of cash-flow, were for expenses in connection with organizing the partnership and the offering. Such payments are not currently deductible. The annual 2 percent of cash-flow fee is not deductible because the petitioners have failed to show that such fee is reasonable compensation for the services performed.

The petitioners have not proved to our satisfaction that the law firm, other than Mr. Eisenberg, provided any meaningful services for the partnerships. Additionally, we conclude that Mr. Filler did perform services for the partnerships. The expense for such services of both men would be currently deductible for the partnerships. Unfortunately, the petitioners have not provided us with a basis for valuing such services, and it is clear that such services were not worth 2 percent of the partnerships' cash-flow. Additionally, such fees were not the result of arm's-length negotiations between unrelated parties having adverse economic interests; the amount of such fees was supplied by Messrs. Eisenberg and Filler.

The Commissioner determined that advertising payments made by Balmoral in 1977 and 1978, and by Shelburne in 1978, to Paramount are not currently deductible, as they were part of the purchase price and should be capitalized. Section 162(a) allows a deduction for ordinary and necessary

expenses incurred in carrying on a trade or business. Because the Commissioner first raised this issue in his notices of deficiency, the petitioners bear the burden of proving that the amounts claimed by them satisfy the requirements of this provision. Rule 142(a).

The Commissioner argues that the advertising payments described in the "First Love," "The One and Only," and "Heaven Can Wait" distribution agreements were actually part of the cash downpayment for each motion picture interest, although they were described as advertising payments in order to provide a current deduction for such payments. In support of his position, the Commissioner states that the other motion pictures in this case did not contain such a clause and neither did the motion picture in the Ambassador partnership. In the Paramount-FWC acquisition agreements for "Grease," "Foul Play," "Bears 3," and the Ambassador motion picture, the cash payments at or near execution and the short-term recourse notes equal 25 percent of the purchase price of each film; for "First Love," "The One and Only," and "Heaven Can Wait," the same percentage is reached only if the advertising expense is included with the cash and short-term recourse notes. The Commissioner asserts that this pattern indicates that Paramount sells a contract interest in its motion pictures for a fixed percentage, regardless of what the payment is called.

The Commissioner notes that Paramount treated the advertising payments as part of the purchase price. For financial reporting, Paramount reduced its investment in the motion pictures by amounts which included the advertising payments. In computing its qualified U.S. production costs for investment credit purposes, Paramount subtracted the advertising payments, at least for "First Love" and "The One and Only." Additionally, Paramount previously estimated that it would spend more than five times the amount set forth in the distribution agreements on advertising for the three films. In fact, within 8 months of their initial release, Paramount had incurred advertising expenses of $1,430,000 for "First Love," $3,770,000 for "The One and Only," and $13,830,000 for "Heaven Can Wait."

The petitioners contend that Balmoral and Shelburne wanted to make certain that Paramount spent sufficient

funds on advertising the motion pictures. Paramount initially refused to commit to a minimum advertising amount, but finally agreed to spend at least as much as the partnerships gave them for advertising. Mr. Heyman then discussed the advertising campaigns with Paramount, and the partnerships made sure that the amounts were properly expended.

We conclude that the Commissioner's determination is correct. The petitioners have failed to persuade this Court by relying on uncorroborated and not readily believable reasons for incurring the advertising expenses. By contrast, the Commissioner's evidence is objective and believable.

Amounts paid or incurred to organize a partnership may, at the election of the partnership, be treated as deferred expenses and amortized over a period of not less than 60 months. Sec. 709(b)(1). Organizational expenses are expenditures which (1) are incident to the creation of a partnership, (2) are chargeable to capital account, and (3) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Sec. 709(b)(2). Examples of organizational expenses include legal fees for services incident to the organization of the partnership (such as negotiation and preparation of a partnership agreement), accounting fees for services incident to creation of the partnership, and filing fees. Sec. 1.709-2(a), Income Tax Regs.

The Commissioner determined that the partnerships were not entitled to amortization deductions for organizational costs in any amount for the years at issue. In the notices of deficiency, the Commissioner stated:

It is determined that the amount claimed as amortization expense is not allowable because it has not been shown that the amount used as basis for calculating the expense was paid or if paid, that such amount is amortizable. Furthermore, it has not been shown that the underlying obligation was the taxpayer's liability or that the obligation was not subject to a contingency.

In the amended answer for Mr. and Mrs. Durkin's 1977 taxable year, the Commissioner stated:

Subsequent analysis of the facts also indicates that Balmoral is not entitled to a deduction for the amortization expense claimed for 1977.

The Commissioner now concedes that the partnerships paid the amounts capitalized as organizational costs, that the obligations were the partnerships', and that the obligations were not subject to a contingency. His position is that the amounts allocated to organizational costs greatly exceeded the value of the services properly allocable to these costs. He argues that the law firm had provided organizational services for many similar limited partnerships in the past and "must have perfected its boilerplate language by the time Balmoral was organized." Further, the Commissioner states that the documentation produced first for Balmoral and then Shelburne was virtually identical, yet the organizational cost for Balmoral was $22,500 and such cost for Shelburne was $55,000.

The petitioners contend in their brief that the Commissioner does not dispute that the costs claimed by the partnerships were for organizational costs, as he did in the notices of deficiency and amended answer; the Commissioner simply states his unsubstantiated belief that the fees are unreasonable.

We agree with the petitioners that the Commissioner has conceded all the objections set forth in the notices of deficiency for disallowing the organizational costs, and the amendment to answer did not provide adequate notice to the petitioners of the valuation argument. Not until his brief did the Commissioner raise the valuation argument. Given such lack of adequate notice, and our belief that the Commissioner's valuation argument compels the petitioners to produce different evidence than the arguments set forth in the notices of deficiency and the pleadings, we think that consideration of the Commissioner's valuation argument would unfairly prejudice the petitioners. See *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555-557 (1973), and the cases cited therein. Accordingly, we decline to consider such argument.

In his notice of deficiency to Mr. and Mrs. Grossman for 1978, the Commissioner disallowed the deduction for rent expense of $4,859.40 for 1978 claimed by Shelburne. Such deduction relates to the cost of private screenings of Shelburne motion pictures for the partners. Among the reasons given for the disallowance was the failure to prove

that the amounts claimed were ordinary and necessary business expenses and that such amounts were obligations of the partnership which were paid by the partnership. Mr. and Mrs. Grossman have the burden of proving that the Commissioner's determination is incorrect. Rule 142(a).

The Supreme Court in *Welch v. Helvering*, 290 U.S. 111, 113 (1933), gave meaning to "ordinary and necessary expenses" as the terminology was used in the predecessor of section 162(a). The Court indicated that "necessary" means "appropriate and helpful" in "the development of the petitioners business." Whether an expenditure is ordinary and necessary is a factual determination. *Commissioner v. Heininger*, 320 U.S. 467 (1943).

In his brief, the Commissioner states that "once the investment was made, the die was cast. Screenings thereafter could affect neither the decision whether to invest nor the way the films were exploited by Paramount." While we agree with the Commissioner that expenses which inure to the benefit of partners must be carefully scrutinized, we conclude that the substantiated expenses were ordinary and necessary. The screenings and associated activities were, given the amount invested, relatively inexpensive, and they served the purposes of maintaining good relations between the partners and allowing them to become familiar with the major assets of the partnership.[20]

At trial, Mr. Filler testified that private screenings of the Shelburne motion pictures were held for investors and their families. He was not specific as to how many such screenings occurred or how much such screenings cost. A letter dated July 19, 1978, which was admitted into evidence, shows that "Foul Play" was to be privately shown at the Edens Theatre on August 6, 1978, and that The Mixing Bowl would cater such showing. Thirteen Shelburne checks, totaling $4,729.40, were admitted into evidence. Several checks had notations indicating that they were for payment of theater rentals and related screening activities, including the August 6, 1978, showing of "Foul Play." Checks totalling $2,547 were proved to be related to screening activities, and such amount is allowed as a

---

[20]We observe that Shelburne had merely a contractual right to proceeds from the motion pictures. However, the motion pictures are the source of all revenue to Shelburne.

deduction. Such checks were to the order of The Mixing Bowl, Edens I Theatre, Edens #2 Theatre, and Plitt Theaters Management, Inc. We observe that this is a small deduction in a very complex case; the parties should have settled the issue on an amicable basis.

The next issue for determination is whether the partnerships are entitled to deductions in any amount for professional fees for the years in question. In his notices of deficiency for all years, except Mr. and Mrs. Durkin for 1979 and Mr. and Mrs. Grossman for 1979 and 1980, the Commissioner determined that all such fees were not deductible because they were not ordinary and necessary, were expenses for which no timely election to amortize had been made, or were capital expenditures. The notice of deficiency sent to Mr. and Mrs. Durkin for 1979 contained a determination that all professional fees were not deductible. However, such notice of deficiency did not contain an explanation of such determination. The notices of deficiency sent to Mr. and Mrs. Grossman for 1979 and 1980 only contained the ordinary and necessary business expense reason. The burden of proof on this issue for each year and each petitioner will be allocated in accordance with the reasons provided in each notice of deficiency and the theory espoused by the Commissioner. Rule 142(a).

Balmoral claimed deductions for professional fees in the amounts of $113,390 for 1977, $24,804.23 for 1978, $10,911.73 for 1979, and $19,091.77 for 1980. Shelburne claimed deductions for professional fees in the amounts of $440,920.10 for 1978, $253,648.52 for 1979, and $44,602.05 for 1980. The Commissioner concedes the deductions claimed by Balmoral for payments to Weiss & Co. for 1978, 1979, and 1980, and the deductions claimed by Shelburne for similar payments in 1979 and 1980. He concedes all deductions for payments to Solomon, Finger & Newman. The petitioners concede the nondeductibility of $32,350 of professional fees paid by Balmoral to the law firm and Weiss & Co. in 1977, and $43,500 of professional fees paid by Shelburne to such payees in 1978 as syndication expenses. The petitioners also concede that $10,000 of the reported 1977 professional fees paid by Balmoral to the law firm, and $20,000 of the reported 1978 professional fees

paid by Shelburne to the law firm should be capitalized and added equally to depreciable basis of each of the motion pictures. Additionally, the petitioners concede that all professional fees paid to Taft & Kaminsky should be added to the depreciable basis of the pictures. The parties agree that such addition is to be equal, on a per-motion-picture basis, within each partnership.

The petitioners argue that, with the exception of the amounts conceded by them, all of the professional fees incurred and paid are currently deductible under section 162 or section 212(3).[21] Concerning the initial year's professional fees for the partnerships, 1977 for Balmoral and 1978 for Shelburne, they request that we apply the *Cohan* rule and determine that such fees are currently deductible. In support of such request, the petitioners argue that because of the law firm's expertise, little time was needed to organize and syndicate these partnerships. The logical conclusion, according to the petitioners, is that the law firm's fees were for a wide variety of services which constituted ordinary and necessary business expenses. For the remaining years, the petitioners argue that such fees could not be organizational expenses because the partnerships were already in operation and, like the initial year's professional fees, were ordinary and necessary expenses arising from tax advice, negotiations with Paramount, and similar ongoing business activities.

The Commissioner contends that all of the professional fees reported on the partnerships' returns were incurred in connection with the organization of the partnerships and, therefore, are not currently deductible. He supports this contention by pointing out that the amount of professional fees paid by each partnership in its first 2 years of operation is very close to what the private placement memorandums indicated would be paid for organization expenses. The Commissioner states that the petitioners presented no evidence to establish what portion of the professional fees are currently deductible. Therefore, he argues, the *Cohan* rule may not be applied. Additionally, he would have us find that none of the professional fees reported in later years are deductible.

---

[21]See note 18 *supra*.

The *Cohan* rule was set down by the Second Circuit in *Cohan v. Commissioner*, 39 F.2d 540 (1930), revg. and remanding 11 B.T.A. 743 (1928):

> The teaching of the *Cohan* case is that where there is an evident right to a deduction but there is no showing of the exact amount of the deduction, the court is to determine the appropriate amount for the deduction, weighing its judgment heavily against the taxpayer who is responsible for the deficiencies in proof. *Bodoglau v. Comm[issioner]*, 230 F.2d 336 (CA 7th, 1956) * * * . [6 J. Mertens, Law of Federal Income Taxation, sec. 25.04 n. 6, ch. 25, at 15 (1985 rev.).]

However, where a petitioner has ready access to material evidence in support of an allegedly allowable deduction and fails to produce such evidence, it may not be appropriate to apply the *Cohan* rule. See *Rosenstein v. Commissioner*, 32 T.C. 230 (1959). Where proof is lacking of any deductible item, the *Cohan* rule is not to be applied. See *Crowley v. Commissioner*, 34 T.C. 333, 350 (1960).

We conclude that the legal fees paid to the law firm by Balmoral in 1977 and 1978 and Shelburne in 1978 and 1979 were substantially all for the organizational services referred to in the private placement memorandums. We conclude that the legal fees paid to the law firm by Balmoral in 1979 and 1980 and Shelburne in 1980 were for ongoing ordinary and necessary business services provided by Mr. Eisenberg and, therefore, were currently deductible. Mr. Eisenberg provided similar services for Balmoral in 1978 and Shelburne in 1979. We estimate the cost of such services as $5,377.31 for Balmoral in 1978. Such amount was incurred by Balmoral for Mr. Eisenberg's services in 1979. Similarly, we conclude that $8,022.05 is a reasonable estimate of the fees associated with Mr. Eisenberg's services for Shelburne in 1979. These amounts are deductible in the years incurred as ordinary and necessary business expenses.

The Balmoral private placement memorandum stated that approximately $158,500 from the offering proceeds would be used "among other things, to pay fees and expenses incurred or to be incurred in connection with establishing the Partnership, negotiating contracts for the acquisition and distribution of the Pictures, and preparation of this Memorandum" and as payment for "legal, accounting and

other expenses [incurred] in connection with the organization of the Partnership and this Offering." The Shelburne private placement memorandum contained nearly identical language regarding the disposition of approximately $755,000. In 1977 and 1978, Balmoral reported professional fees totaling $151,726.60, and in 1978 and 1979, Shelburne reported professional fees totaling $719,570.62.

At trial, Mr. Filler, a long-time business associate of law firm members, was evasive as to the relationship between the services provided by the law firm and the fees it received from the partnerships. He indicated that at least some of such fees were meant to pay for organization and syndication costs. The amount of such fees was determined "By an assessment of the value of their services, time involved, expertise involved, the responsibility assumed[,] and the importance of their counsel in relationship to the enormous investment that would be made by limited partners in this transaction." None of the bills from the law firm identify the nature of the work performed beyond occasionally naming one of the motion pictures.

From the record, it is clear that Mr. Heyman carried out the vast majority of negotiations with Paramount and reviewed the distribution statements; Mr. Filler handled the administrative chores of the partnerships; and Paramount carried out distribution of the motion pictures. Solomon, Finger & Newman conducted special audits of Paramount, and Weiss & Co. prepared the financial statements and tax returns for the partnerships. It follows that professional fees paid to Weiss & Co. and not conceded by the petitioners are currently deductible in the appropriate years. It is also clear that Mr. Eisenberg occasionally contacted Mr. Filler, Mr. Heyman, and Paramount concerning the partnerships. Finally, it is clear that the total professional fees incurred by each partnership in its first 2 years was very close to the anticipated organization and syndication costs. The only thing that is not clear is what the law firm did in return for the fees it received from the partnerships. Other than Mr. Eisenberg's activities and recitals by Mr. Filler and Mr. Eisenberg of the many services performed by the law firm, most of which appear to duplicate the efforts

of persons mentioned above, there is no evidence of activity by the law firm on behalf of the partnerships.

The petitioners' failure to provide any objective evidence concerning the services performed by the law firm for the partnerships is troubling. If any objective evidence exists, such as time sheets, petitioners' counsel, who are members of the law firm, should have produced such evidence. On this record, we cannot determine what services the law firm performed for the partnerships, other than Mr. Eisenberg's activities, and therefore, we cannot allow a deduction for any of the legal services except for those specifically allocated to Mr. Eisenberg.

In his notices of deficiency, the Commissioner made several interest expense adjustments to both Balmoral's and Shelburne's returns. He concedes all such adjustments except those relating to the "bonus payments" by Shelburne to Delta. Such payments were in the amount of 10 percent of all worldwide nontheatrical gross receipts received by the distributor, Paramount. The Commissioner determined that such payments were not deductible because they were not ordinary and necessary business expenses or because the underlying obligation was not a bona fide indebtedness. Mr. and Mrs. Grossman bear the burden of proof on this issue. Rule 142(a).

The source of such interest expense is a loan from Delta to Shelburne with a 9½-percent-per-annum interest rate and the bonus payment provision. The source of such loan was four Netherlands Antilles corporations which loaned the principal amount to CMS at 9-percent interest per annum. Delta, a partnership controlled by CMS, then loaned the funds to Shelburne for one-half percent more and a bonus payment.

A taxpayer may deduct all interest paid or accrued within the taxable year on indebtedness. Sec. 163(a). An indebtedness pursuant to section 163(a) "means an existing, unconditional, and legally enforceable obligation for the payment of money." *Kovtun v. Commissioner*, 54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971); see *Titcher v. Commissioner*, 57 T.C. 315 (1971). Interest on indebtedness is generally defined to mean "compensation for the use or forbearance of money." *Deputy v. duPont*, 308 U.S. 488,

498 (1940). The real purpose and intention of the parties is controlling and the form of the transaction will be looked through to determine the real character of the payment. *Knetsch v. United States*, 364 U.S. 361 (1960); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982). Whether the bonus payments were interest payments is a question of fact, the burden of proof of which is on the petitioners. Rule 142(a); *McSorley's, Inc. v. Commissioner*, 323 F.2d 900, 901-902 (10th Cir. 1963).

In his brief, the Commissioner's position is that the bonus payments to Delta were a priority distribution to Delta; he allowed interest deductions for payments relating to the 9½-percent-per-annum payments on the outstanding balance of the principal. Therefore, the underlying debt appears recognizable for tax purposes. To overcome the Commissioner's determination, the petitioners must prove that the bonus payments were compensation associated with such debt.

We conclude that the petitioners have failed to meet their burden of proof. We can find no reasonable linkage between the Delta loan to Shelburne and the bonus payment, other than its use as a mechanism to divert funds from Shelburne to CMS, thereby increasing the income of the partnerships and trusts associated with or established for the benefit of the members of the law firm or their immediate families.

The loan to Shelburne was almost certain to be repaid and, therefore, the bonus payments are not compensation for the use of the funds. The limited partners, all of whom had to be financially secure to participate in Shelburne, were due to make capital contributions in excess of the loan principal. Additionally, partnerships or trusts for the benefit of members of the law firm or their immediate families held 50 percent of the interests in Capital B, one of Shelburne's general partners. Therefore, if the general partners of CMS were financially secure, the general partners of Shelburne were at least as secure. Finally, the terms of the loan were not negotiated at arm's length; Mr. Filler and Mr. Eisenberg determined the terms of the agreement. In contrast, during the same time period, Paramount received only 8 percent on the nonrecourse notes from FWC, and the four Netherlands Antilles corporations received 9 percent.

Mr. Filler and Mr. Eisenberg testified that the financing was necessary and the terms of the loan were reasonable. They attempted to arrange loans with banks, but the banks were unwilling to make a loan secured by the limited partners' promissory notes for contributions and Shelburne's interest in the four motion pictures. They then determined that 9½-percent interest and the bonus payment would make the loan commercially competitive. Their testimony was not corroborated by objective evidence; no letters concerning such attempts to secure bank financing were presented, and no bank representatives were called to testify.

As a final issue in his brief, the Commissioner argues that this Court erred in quashing the documents portion of his trial subpoenas duces tecum. The Commissioner charges that:

The Court's actions in refusing to enforce respondent's formal discovery and in quashing virtually all of the documents portions of respondent's trial subpoenas *duces tecum* prevented respondent from fully testing the veracity of witnesses who were directly aligned with and/or controlled by the shelter promoters who, as the evidence has shown, had (and still have) a substantial financial stake in the outcome of this trial. And, as the record shows, respondent's worst fears were realized when various witnesses were put to the test.

The Commissioner's argument is made in a case where there are approximately 900 exhibits, about 10,000 pages in length, and approximately 1,800 pages of transcript, and there were over 1,300 pages in the briefs.

Such subpoenas duces tecum were served on the following individuals, partnerships, and corporations: Messrs. Eisenberg, Filler, Janger, Kanter, Lippitz, and Weiss; FWC; First National Bank of Chicago; Jacobson, Scott & Gordon & Co.; and Paramount. In general, the documents were to be produced on September 10, 1984, 1 week before the trial began and were designed to uncover information the Commissioner failed to get when the Court denied the Commissioner's discovery because the requests were overly burdensome compared to their probative value.

The requests by the Commissioner in such subpoenas duces tecum were usually for all of the documents that involved one or more named individuals or entities from

1977 through 1980 which were in the recipient's possession. However, in some instances, the subpoenas were directed to an entity not directly involved in the central transactions in question, such as CMS or Delta, and requested such entity to produce all of its books and records.

Generally, the Court ordered the recipients of the subpoenas to produce documents which the Commissioner could identify as related to the transactions at issue in the case. However, when the Commissioner merely sought to have the persons subpoenaed produce all of their books and records so that the attorney for the Commissioner could examine them to find out whether they contained any helpful records, and when such person was not a party to the case but was only indirectly involved in some of the transactions, the Court refused to support the subpoena on the ground that the request was too burdensome when weighed against its probative value. See Rule 70(e); Fed. Rules of Civ. P. 26(b); *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1088-1089 (D. Minn. 1974); *Houdry Process Corp. v. Commonwealth Oil Refining Co.*, 24 F.R.D. 58 (S.D. N.Y. 1959); *Bordonaro Bros. Theatres, Inc. v. Loew's Inc.*, 7 F.R.D. 481 (W.D. N.Y. 1947); *United States v. United States Alkali Export Association*, 7 F.R.D. 256 (S.D.N.Y. 1946). The Court pointed out to the counsel for the Commissioner that he could call those persons as witnesses and that the matter should have been investigated by a revenue agent before the trial.

Despite the fact that at least 500 petitioners have cases related to the case at hand, which concern millions of dollars, and for which notices of deficiency were first issued more than 2 years before trial, the Commissioner had made very little, if any, prior investigation. As a result, his attorney had to attempt through discovery and subpoenas issued by the Court to make the type of investigation that ordinarily would have been carried on by a revenue agent. It is not our position to tell the Commissioner how to carry out his responsibilities, but it is altogether obvious that when cases are brought to court in this manner, much more time is required by the Court and the attorneys to prepare the case for trial and to actually try the case. Had an investigation been made beforehand, many of the minor

issues could have been settled; the authenticity of many of the documents could have been agreed upon; and more helpful stipulations could have been made. The processes of this Court are simply not designed to be used to conduct a thorough investigation of a complex tax case.

*Decisions will be entered under Rule 155.*